**VALANCE, Plaintiff–Appellant,**

v.

**Gaylon WISEL, Mike Reneau, Ed Pearce, et al., Defendants–Appellees.**

**No. 96–1870.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 17, 1996.

Decided April 7, 1997.

Chris K. Starkey (argued), Fort Wayne, IN, for Valance.

Philip E. Kalamaros (argued), South Bend, IN, J. Daniel Brinkerhoff, Garrett, IN, for Mike Reneau, Ed Pearce, Larry Balliet, Harold Werkheiser, Gaylon Wisel.

J. Daniel Brinkerhoff, Garrett, IN, Thomas W. Belleperche (argued), Hunt, Suedhoff, Borror & Eilbacher, Fort Wayne, IN, for Timothy Rice.

Before EASTERBROOK, RIPPLE, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Valance[1] appeals the district court's entry of summary judgment in favor of the six law enforcement officers he sued under 42 U.S.C. § 1983. His suit grows out of a traffic stop that occurred in Garrett, Indiana on May 28, 1995. Valance maintains that the officers violated his rights under the Fourth and Fourteenth Amendments when they stopped his vehicle without probable cause and then detained him for the purpose of searching the vehicle. The district court concluded that the summary judgment record established probable cause for the stop and that the subsequent search of the vehicle was reasonable under the circumstances. Alternatively, the court believed that even if Valance could establish a violation of his constitutional rights, the officers would be entitled to qualified immunity from his claim to money damages. For the following reasons, we affirm the judgment of the district court.

## I.

The relevant facts are largely undisputed. At approximately 11:20 p.m. on the evening of May 28, 1995, Officer Gaylon Wisel of the Garrett Police Department was on "D.U.I. Patrol" when he observed a car cross the center line twice while navigating an "S" curve. Wisel suspected that the driver may be under the influence of alcohol, and he

---

1. "Valance" is the plaintiff's full, legal name.

therefore activated his lights and stopped the car. Wisel approached the vehicle and told its driver (Valance) that he had been stopped for going left of center. At the time, Valance indicated that he had just awakened, that he may not have been paying attention, and that he could understand how he may have gone left of center. Yet Valance now believes that his car never crossed the center line that evening. Wisel asked Valance whether he had been drinking, and Valance told the officer that he does not drink. Wisel then asked whether Valance would be willing to submit to a chemical test, and Valance indicated that he would. When Wisel requested to see his driver's license and registration, Valance was able to produce the registration but not his license, which he apparently had left at his sister's house earlier in the evening along with his wallet. Wisel told Valance to wait in his car while the officer called in his name and registration.

When Wisel reported over his radio that he had stopped a man named Valance, he was told that Valance was a convicted felon and that he was considered dangerous. Wisel was warned to be careful with Valance and to wait for support. He therefore remained in his squad car for fifteen to twenty minutes until Garrett police officers Ed Pearce and Mike Reneau arrived. Wisel and Reneau then approached Valance's vehicle, Wisel on the driver's side and Reneau on the passenger side, while Pearce remained at the rear of the vehicle. Wisel and Reneau were carrying flashlights, but neither had drawn a weapon. Upon reaching the driver's side door, Wisel asked Valance whether he was carrying any weapons, and Valance told the officer that he was not. Valance maintains that it was at this point that Wisel handed him a warning citation for driving left of center, but according to Wisel, the citation was given to Valance only later in the encounter.

Almost immediately after Valance denied having any weapons in the vehicle, Officer Reneau spotted what appeared to be a Colt Python .357 handgun on the floor in front of the passenger seat. He yelled "gun," and Wisel, Reneau, and Pearce drew their weapons. Wisel ordered Valance out of the car, and as he complied, Valance indicated that the gun was merely a pellet gun. Wisel escorted Valance to the squad car and asked whether Valance would permit the officers to search his vehicle. Valance told Wisel that the officers were free to search his car. Wisel then handcuffed Valance and placed him in the back seat of the squad car. While Wisel and Reneau conducted the search, Valance remained handcuffed in the squad car under the watch of Pearce.

As Wisel was taking Valance to the squad car and obtaining his consent to search, Reneau opened the passenger side door of Valance's vehicle and removed the holster and handgun from the floor. Reneau soon discovered that the weapon was merely a pellet gun that only resembled a Colt Python .357. Valance apparently used the pellet gun in his job as a private security officer. Because he was a convicted felon, Valance could not obtain a permit to carry an actual firearm, and the pellet gun enabled Valance to appear armed in the course of his security work. In searching the vehicle, Wisel and Reneau found in addition to the pellet gun a PR–24 side handle baton (a nightstick) mounted to the driver's side door and a gun belt containing twelve rounds of live ammunition in the trunk.

As Wisel and Reneau were searching the vehicle, another Garrett squad car arrived carrying Officers Harold Werkheiser and Larry Balliet. Werkheiser asked Wisel whether he had obtained Valance's consent to search the vehicle, and Wisel replied that Valance had verbally consented. Werkheiser directed Wisel to also obtain a written consent, and Wisel therefore approached Valance, removed his handcuffs, and asked Valance to sign a written consent form. Valance reviewed the form and then signed it. Because there were now additional officers on the scene, Wisel did not reapply the handcuffs after Valance had signed the consent form. The search of Valance's vehicle then continued for another ten to fifteen minutes, but no firearms were found.

As the search was nearing completion, Deputy Sheriff Timothy Rice of the Dekalb County Sheriff's Department drove past the scene. One of the Garrett police officers saw Rice and contacted him by radio, asking Rice to return. Rice did so and initially spoke to Officer Werkheiser, who told Rice that a pellet gun, a nightstick, and live ammunition had been found in Valance's vehicle after Officer Wisel had stopped Valance for a routine traffic violation. Rice also observed that Valance's vehicle was blue and that it was equipped with top-mounted amber lights. While observing Valance's vehicle and listening to Werkheiser's report, Rice recalled that a number of women had recently reported to the Sheriff's Department that they had been pulled over by a man operating a blue car who had been impersonating a police officer. Believing that Valance's car fit the description of the vehicle in those reports, Rice decided to photograph both Valance and his vehicle so that the photographs could be compared to the descriptions given by the complaining women. Rice took eight photographs of the vehicle from various perspectives before asking Valance for permission to take his photograph. Valance gave his permission, and Rice proceeded to take one frontal and one profile photograph.

Wisel maintains that at the conclusion of the search, he issued Valance a warning citation for his traffic violation and advised Valance that he was free to leave. As noted earlier, Valance indicates that he received the citation much earlier, before Reneau had spotted the pellet gun. Valance then left the scene. The entire encounter lasted approximately one hour.

Valance subsequently filed this suit under 42 U.S.C. § 1983, alleging that the original stop of his vehicle was pretextual and that the subsequent detention and search were unreasonable under the Fourth and Fourteenth Amendments. The district court granted summary judgment to the officers, finding that Valance had not established a violation of his constitutional rights. Specifically, the court found that the initial stop was lawful because Officer Wisel reasonably believed that Valance had committed a traffic violation. The subsequent detention and

search also were reasonable, the court concluded, once Officer Reneau spotted what appeared to be a Colt Python .357 handgun in the possession of someone he knew to be a convicted felon. Alternatively, the court found that even if Valance could establish that the detention and search were unconstitutional, the defendant officers would be entitled to qualified immunity because they had searched the vehicle only after obtaining what appeared to be a valid consent to search. Finally, the court found that Deputy Rice had not unlawfully detained Valance by taking his photograph.

## II.

Valance argues that two disputed factual issues preclude the entry of summary judgment against him. First, Valance argues that a material factual dispute exists on the question of whether he actually crossed the center line while driving through Garrett on the evening in question. Valance asserts that if a reasonable jury were to resolve that issue in his favor, it could find that Wisel's decision to stop him was pretextual. Second, Valance argues that the dispute as to when Wisel issued the traffic citation precludes summary judgment on the question of whether the detention and search were unreasonable. Finally, Valance maintains that a reasonable jury could have found that his oral and written consents to the search were involuntary. Thus, according to Valance, that issue too should only have been resolved after a trial.

In considering those arguments, we view the summary judgment record in the light most favorable to Valance, resolving any factual disputes in his favor and according him the benefit of all reasonable inferences to be drawn from the evidence. *Jones v. Webb*, 45 F.3d 178, 181 (7th Cir.1995). Valance cannot succeed in creating a factual dispute, however, solely by pointing to allegations in his pleading; he must instead produce evidence showing that there is a disputed issue for trial. Fed.R.Civ.P. 56(e); *Doe v. Roe No. 1*, 52 F.3d 151, 154 (7th Cir.1995); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). The existence of a factual dispute will not preclude sum-

mary judgment if the disputed fact is not material—that is, if resolution of the factual dispute would not affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Swaback v. American Info. Tech. Corp.,* 103 F.3d 535, 540 (7th Cir.1996). Whether summary judgment was properly entered based on the record and the law is a matter we consider de novo. *Swaback,* 103 F.3d at 539; *Jones,* 45 F.3d at 181.

### A.

■ As the Supreme Court recently reaffirmed in *Whren v. United States,* — U.S. ——, ——, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996), the "[t]emporary detention of individuals during the stop of an automobile by police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'" under the Fourth Amendment. *See also Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1395–96, 59 L.Ed.2d 660 (1979). Thus, such a stop will violate the Constitution if it is deemed "unreasonable" under the circumstances. *Whren,* — U.S. at ——, 116 S.Ct. at 1772; *United States v. Williams,* 106 F.3d 1362, 1365 (7th Cir.1997). A police officer's decision to stop an automobile will be considered reasonable, however, if the officer had probable cause to believe a traffic violation occurred. *Whren,* — U.S. at ——, 116 S.Ct. at 1772; *see also Williams,* 106 F.3d at 1365. That is the case even if it can be shown that the officer actually made the stop for some other reason—for example, a hunch that the vehicle's driver was engaged in drug trafficking. *Whren,* — U.S. at ——, 116 S.Ct. at 1774 (constitutional reasonableness of traffic stop does not depend "on the actual motivations of the individual officers involved"). After *Whren,* the officer's subjective intentions "play no role" in our probable cause inquiry. *See also United States v. Murray,* 89 F.3d 459, 461 (7th Cir.1996); *United States v. Willis,* 61 F.3d 526, 530 (7th Cir.1995) (discussing objective test employed by this circuit prior to *Whren* ), *cert. denied,* — U.S. ——, 116 S.Ct. 2528, 135 L.Ed.2d 1052 (1996).

■ In the present case, Officer Wisel came forward with the following evidence to establish probable cause for the traffic stop. At approximately 11:20 p.m., Wisel was patrolling the streets of Garrett when he observed Valance's car twice cross the center line while navigating an "S" curve. The officer immediately suspected that the car's driver may be under the influence of alcohol, and he therefore stopped the vehicle. Wisel maintains that after explaining to Valance that his vehicle had gone left of center, Valance told the officer that "he was tired because he was working a lot of overtime and could understand how he could have gone left of center." (Wisel Aff. para. 6.) Wisel then asked Valance whether he had been drinking, and when Valance indicated that he had not, Wisel asked whether Valance would be willing to submit to a chemical test. Valance said that he would. Wisel later gave Valance a warning citation for going left of center. If unrebutted, this evidence would establish probable cause for the traffic stop. *See United States v. Smith,* 80 F.3d 215, 219 (7th Cir.1996) (officer had probable cause to stop vehicle that had been straddling lanes and had failed to signal before turning); *United States v. Quinones–Sandoval,* 943 F.2d 771, 774 (7th Cir.1991) (improper lane usage provides probable cause for traffic stop); *United States v. Fiala,* 929 F.2d 285, 288 (7th Cir. 1991) (traffic stop for improper lane usage not pretextual).

■ Yet Valance insists that a material factual dispute exists on this issue because he alleged in his complaint and stated in his deposition that he never crossed the center line while traversing the "S" curve that evening. First, we put aside the complaint's allegation because, as we said, such an allegation is insufficient to create a factual dispute on summary judgment once the moving parties have come forward with evidence indicating that they are entitled to judgment as a matter of law. Valance is required at that point to come forward with evidence supporting the complaint's assertion. Fed.R.Civ.P. 56(e); *Waldridge,* 24 F.3d at 920. The only evidence to which he points, however, is the following question and answer from his deposition:

Q. Do you believe that you were traveling across the center line?

A. No, sir.

(R. 38 at 38.) Although the issue is a close one, we do not think this snippet of deposition testimony is sufficient to require a trial on Valance's claim of a pretextual traffic stop.

Significantly, his deposition testimony does not establish that Valance did not in fact travel across the center line as Officer Wisel asserts; it indicates only that Valance does not currently "believe" he crossed the center line that evening. Valance's less than definitive knowledge does not cast sufficient doubt on what the officer reasonably believed at the time. *See Hebron v. Touhy,* 18 F.3d 421, 423 (7th Cir.1994). Furthermore, Valance's current belief is somewhat inconsistent with the statements he made to Officer Wisel at the time of the stop. According to the officer, Valance indicated that he was tired and that he could understand how he may have gone left of center. Valance does not deny that this is what he told Wisel when stopped. Although he cannot remember precisely what was said, Valance admits to implying that he was groggy and that he may not have been paying attention. (*See* R. 38 at 41.) It is thus undisputed that Valance indicated to Wisel that he really did not know whether he had crossed the center line but that he could understand how he may have done so. Yet he now is insisting that he does not believe he ever crossed the center line. We think a reasonable jury could only take from all of this that Valance really does not know one way or the other. Thus, his evidence does not rebut that proffered by the officer. Finally, it is undisputed that upon stopping the vehicle, Officer Wisel asked Valance whether he had been drinking and whether he would be willing to submit to a chemical test. The officer's undisputed conduct is therefore consistent with the assertion that he suspected Valance may have been drinking after seeing Valance's vehicle twice cross the center line. In these circumstances, we do not believe that a reasonable jury could find that probable cause for the traffic stop was lacking simply on the basis of Valance's current belief that he navigated the "S" curve without crossing the center line. Summary judgment was therefore proper on Valance's claim that the initial traffic stop was pretextual.

**B.**

■ Valance next contends that his rights under the Fourth Amendment were infringed when he was detained after having received a warning citation for the traffic violation. As we noted, there is a dispute as to when during the encounter Wisel issued the warning citation. Wisel maintains that he issued the citation only after the search of Valance's vehicle was completed, but Valance testified in his deposition that Wisel returned his registration and issued the warning citation much earlier—shortly after Reneau and Pearce had arrived and before any mention had been made of searching the vehicle. Because we are required to view the summary judgment record in the light most favorable to Valance, we accept his version of this disputed factual question. Yet we do not agree that under Valance's version of the facts, a Fourth Amendment violation has been shown.

■ As Fourth Amendment seizures, traffic stops like this one are governed by the principles applied by the Supreme Court to investigative detentions in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See, e.g., United States v. Finke,* 85 F.3d 1275, 1278 (7th Cir.1996). In addition to being justified at its inception, then, a traffic stop also must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879; *Finke,* 85 F.3d at 1279. As we observed in *Finke,* the detention caused by the traffic stop "must be 'temporary and last no longer than is necessary to effectuate the purpose of the stop.'" 85 F.3d at 1279 (quoting *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983)). Thus, even a lawful traffic stop could develop into an unreasonable seizure if Officers Wisel, Reneau, and Pearce detained Valance without his consent after the purpose of the stop was completed, so long as nothing occurred in the course of the stop to give the officers the reasonable suspicion needed to support a further deten-

tion. *See Finke,* 85 F.3d at 1280; *United States v. Mesa,* 62 F.3d 159, 162 (6th Cir. 1995); *United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.), *cert. denied,* 511 U.S. 1095, 114 S.Ct. 1862, 128 L.Ed.2d 484 (1994). According to Valance, the traffic stop here, even if lawful at its inception, developed into an unreasonable seizure once the officers continued to detain him after Wisel returned his vehicle registration and issued him a warning citation for driving left of center.

Valance's argument, however, ignores the fact that Officer Reneau spotted what appeared to be a Colt Python .357 handgun on the floor of the vehicle at essentially the same time that Valance was receiving his warning citation.[2] Reneau yelled "gun" to alert his colleagues, and all three officers then drew their weapons. It is therefore clear that something occurred in the course of this traffic stop to provide the officers with a reasonable suspicion that Valance may be involved in criminal activity in addition to the traffic violation that occasioned the stop. By the time Reneau spotted the gun, the officers knew that Valance was a convicted felon and that he was considered dangerous. It of course is a violation of federal law for a convicted felon to possess a firearm. *See* 18 U.S.C. § 922(g)(1). It also is illegal in Indiana for an individual to carry a handgun in a vehicle without a license, and a convicted felon cannot obtain such a license. Ind.Code §§ 35–47–2–1 & 35–47–2–3(f). Indeed, a convicted felon commits a Class C felony in Indiana when he carries a handgun in a vehicle without a license. Ind.Code § 35–47–2–23(c). Thus, once Reneau saw what he believed to be a handgun on the floor of Valance's vehicle and alerted Wisel and Pearce, the officers possessed information sufficient to create a reasonable suspicion that Valance was violating federal and state law.

Valance nonetheless suggests that those suspicions were quickly dispelled when he indicated to the officers that what Reneau saw was merely a pellet gun. But to ensure their own safety, the officers were not required to accept Valance's representation. Indeed, moments before Reneau spotted the handgun, Valance had denied having any weapons in the vehicle. Thus, the officers had ample reason to doubt Valance's word. At that point, the officers clearly had a reasonable and articulable suspicion that Valance had a weapon or weapons in the vehicle, and they therefore were entitled to examine the weapon Reneau had seen and also to conduct a limited search of those areas within the passenger compartment where Valance may have placed or hidden other weapons over which he could gain immediate control. *See Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3480–81, 77 L.Ed.2d 1201 (1983); *United States v. Fryer,* 974 F.2d 813, 819 (7th Cir. 1992), *cert. denied,* 508 U.S. 941, 113 S.Ct. 2418, 124 L.Ed.2d 641 (1993). As a result, the officers did not violate Valance's Fourth Amendment rights by detaining him while they conducted those investigations.

### C.

Of course, after removing the handgun from the floor of Valance's vehicle, Officer Reneau realized that it was a pellet gun that merely looked like a Colt Python .357. But in searching the passenger compartment, Reneau also discovered that Valance had a nightstick mounted to the driver's side door. Valance explained to the officers that he used these items in his job as a private security officer; he carried the pellet gun, in fact, because as a convicted felon, he was unable to obtain a permit to carry a real firearm. Although the nightstick was found during a search of the vehicle's passenger compartment that clearly was lawful under *Michigan v. Long,* the search did not end there, for the officers also searched the trunk of the vehicle, where they eventually found a gun belt containing twelve rounds of live ammunition.

---

2. Valance does not argue that Reneau had no right to approach the passenger side of his vehicle or that Reneau violated his Fourth Amendment rights by peering into the window and observing the handgun. *Cf. United States v. Willis,* 37 F.3d 313, 316 (7th Cir.1994) (gun on floor of the vehicle was in plain view to anyone approaching the vehicle); *United States v. Hatten,* 68 F.3d 257, 260 (8th Cir.1995) (barrel of gun sticking out from under automobile seat in plain view), *cert. denied,* —— U.S. ——, 116 S.Ct. 1026, 134 L.Ed.2d 105 (1996).

The trunk search cannot be justified under *Michigan v. Long* because Valance would not have been able to gain immediate control of a weapon located there. *See* 463 U.S. at 1053, 103 S.Ct. at 3483 (finding warrantless search of passenger compartment valid but remanding for determination of whether subsequent trunk search could be justified on some other ground).[3] Yet the officers maintain that by that time, Valance had consented first orally and then in writing to a search of the entire vehicle. Valance concedes that he gave his consent but now argues that it was involuntary. He contends that in the absence of a voluntary consent, the search violated his Fourth Amendment rights.

■■■ In *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973), the Supreme Court held that "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Relevant considerations include: the age, education, and intelligence of the individual providing consent; whether he was advised of his rights; how long he was detained prior to giving consent; whether he immediately consented, or whether the police officers made repeated requests for consent; the existence or absence of physical coercion; and whether the individual was in custody. *United States v. LaGrone*, 43 F.3d 332, 334 (7th Cir.1994); *United States v. Kozinski*, 16 F.3d 795, 810 (7th Cir.1994); *see also Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047.

■■■ In a criminal case, the government bears the burden of proving by a preponderance of the evidence that a consent to search was freely and voluntarily given. *United States v. Willis*, 61 F.3d 526, 531 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2528, 135 L.Ed.2d 1052 (1996); *United States v. Saadeh*, 61 F.3d 510, 517 (7th Cir.),

*cert. denied,* —— U.S. ——, 116 S.Ct. 521, 133 L.Ed.2d 428 (1995). In this civil action under 42 U.S.C. § 1983, however, the parties dispute whether that burden remains with state actors like the defendant police officers here, or whether it must be carried by the civil plaintiff.

This court has not directly addressed that question, but the circuits that have are not in agreement. In *Tarter v. Raybuck*, 742 F.2d 977, 980–81 (6th Cir.1984), *cert. denied,* 470 U.S. 1051, 105 S.Ct. 1749, 84 L.Ed.2d 814 (1985), the Sixth Circuit concluded that the defendants in a civil case must bear the burden of proving a voluntary consent to the search, ostensibly because of the "presumption against the waiver of constitutional rights." Yet three other circuits have disagreed, preferring to assign to the plaintiff in a civil action the traditional burden of proving each element of his claim. *Ruggiero v. Krzeminski*, 928 F.2d 558, 562–63 (2d Cir. 1991); *Crowder v. Sinyard*, 884 F.2d 804, 824–26 (5th Cir.1989), *cert. denied,* 496 U.S. 924, 110 S.Ct. 2617, 110 L.Ed.2d 638 (1990); *Larez v. Holcomb*, 16 F.3d 1513, 1517–18 (9th Cir.1994). In *Ruggiero*, for example, the Second Circuit observed that although a warrantless search generally is considered presumptively unreasonable, "[t]he operation of this presumption ... cannot serve to place on the defendant the burden of proving that the official action was reasonable." 928 F.2d at 563. The court concluded that at most, the presumption may require the defendant to produce evidence of consent or of some other recognized exception to the warrant requirement. *Id.* Yet once the defendant has done so, "the ultimate risk of nonpersuasion must remain squarely on the plaintiff in accordance with established principles governing civil trials." *Id.* (citing Fed.R.Evid. 301); *see also Crowder*, 884 F.2d at 825–26 (plaintiff bears the burden of proof in a section 1983 action alleging a warrantless search even where the defendant seeks to justify the search under an exception to the warrant

---

**3.** Of course, the trunk search would be lawful if the discovery of the pellet gun and nightstick provided the officers with probable cause to believe that the vehicle contained contraband or evidence of criminality. *E.g., United States v. Young*, 38 F.3d 338, 340 (7th Cir.1994) (probable

cause authorizes search of trunk and closed compartments). In light of our resolution of the consent issue, however, we need not also decide whether the officers had probable cause to search Valance's trunk.

requirement); *Larez,* 16 F.3d at 1517 (plaintiff asserting an illegal seizure bears the ultimate burden of proving a Fourth Amendment violation where the defendant relies on the plaintiff's consent to justify the seizure); *Amato v. City of Richmond,* 875 F.Supp. 1124, 1133–34 (E.D.Va.1994) (discussing circuit split and following the majority rule), *aff'd. mem.,* 78 F.3d 578 (4th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 167, 136 L.Ed.2d 109 (1996).

 We generally agree with *Ruggiero*'s formulation of the proper allocation of the parties' burdens in a section 1983 action alleging a Fourth Amendment violation. Even if a presumption of unreasonableness arises from the fact of a warrantless search, that does not serve in a civil case to shift "the burden of proof in the sense of the risk of nonpersuasion." Fed.R.Evid. 301. The presumption merely serves to impose on the defendant "the burden of going forward with evidence to meet or rebut the presumption" (*id.*), which a defendant would do by presenting evidence that the plaintiff consented to the search. In order to prove that the search was unreasonable, then, the plaintiff would be required to show either that he never consented or that the consent was invalid because it was given under duress or coercion.

 Although Valance would thus be assigned the ultimate burden of proving that his oral and written consents were involuntary under the *Ruggiero* formulation, that is the correct allocation in this case for an even more fundamental reason. *Ruggiero* involved the warrantless search of a residence, which the Supreme Court has characterized, with limited exceptions, as presumptively unreasonable. *E.g., United States v. Karo,* 468 U.S. 705, 717, 104 S.Ct. 3296, 3304, 82 L.Ed.2d 530 (1984); *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). But this case involves the warrantless search of an automobile, a circumstance in which an exception to that presumption has long been recognized. *See California v. Acevedo,* 500 U.S. 565, 580, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991); *Carroll v. United States,* 267 U.S. 132, 153–56, 45 S.Ct. 280, 285–86, 69 L.Ed. 543 (1925);

*see also Karo,* 468 U.S. at 717, 104 S.Ct. at 3304. Under the "automobile exception" to the warrant requirement, police officers may search a vehicle without a warrant if they have probable cause to believe that the vehicle contains contraband or evidence of criminality. *United States v. Ortiz,* 84 F.3d 977, 983 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 250, 136 L.Ed.2d 177 (1996); *United States v. Young,* 38 F.3d 338, 340 (7th Cir.1994). Thus, the debate in most such cases is over whether the officers had probable cause for the search, and consistent with his traditional burden in a civil case, a plaintiff like Valance would bear the ultimate burden of proving that the search was unreasonable because probable cause was lacking. We see no reason for altering the plaintiff's traditional burden in an automobile search case when the officers rely not on probable cause but on consent in searching the vehicle. We therefore agree with the officers that Valance ultimately must bear the burden of proving that his oral and written consents were involuntary.

 Valance nonetheless contends that even if he is assigned the burden of proof, he has come forward with sufficient evidence to permit a reasonable jury to find that the consents were involuntary. Specifically, Valance emphasizes that at the time he orally consented, he had just been ordered from his vehicle by three officers who had their guns drawn. He had then been escorted to a squad car and was about to be handcuffed when Officer Wisel asked for and obtained his oral consent to search the vehicle. Valance indicated in his deposition that he consented to the search because he believed that if he refused, he would be taken to the Dekalb County lockup. Yet Valance does not dispute that no officer ever threatened to take him to the lockup if he refused to consent. Defendants also point out that Valance admitted in his deposition to knowing that he had a constitutional right to refuse his consent. With respect to their conduct when seeking consent, moreover, defendants emphasize that they drew their weapons only after Reneau had spotted what he believed to be a Colt Python .357 on the floor of Valance's vehicle. The officers had put away

their guns by the time Wisel asked Valance for permission to search his vehicle. Finally, defendants emphasize that Valance was not handcuffed when he orally consented to the search or when he later provided a written consent. Valance insists that because both sides have pointed to facts supporting their respective positions, the district court should not have deemed the consents voluntary as a matter of law but should have permitted a jury to consider, based on the totality of the circumstances, whether the consents were voluntary. *See Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2047–48.

■ Although Judge Lee's opinion suggests that he believed the consents were voluntary, the court did not actually resolve that question in granting summary judgment to defendants. Rather than concluding that no reasonable jury could find the consents involuntary, the court determined that the officers were entitled to qualified immunity because a reasonable police officer in the position of these defendants could have believed that a valid consent had been obtained. (*See* R. 48 at 11–14.) Thus, the court essentially determined that even if a jury would be justified in finding that the consents were the product of police coercion, an objectively reasonable police officer in the position of these defendants could have believed that his actions were lawful. Our review of the district court's qualified immunity determination is de novo. *Elder v. Holloway,* 510 U.S. 510, 516, 114 S.Ct. 1019, 1023, 127 L.Ed.2d 344 (1994); *Frazell v. Flanigan,* 102 F.3d 877, 886 (7th Cir.1996).

■ The doctrine of qualified immunity shields government officials who perform discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The doctrine serves to give "public officials the benefit of legal doubts by relieving them from having to decide, at their financial peril, how judges will decide future cases." *Kernats v. O'Sullivan,* 35 F.3d 1171, 1176 (7th Cir.1994) (internal citation omitted). The test for determining whether a public official is entitled to qualified immunity is objective; we are concerned with whether a reasonable police officer could have believed that defendants' conduct was lawful "in light of clearly established law and the information [the officers] possessed" at the time. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987); *Frazell,* 102 F.3d at 886.

Like the district court, we need not decide whether a reasonable jury could conclude that the consents here were involuntary because we agree with the lower court that reasonable police officers in the position of these defendants could have believed that their search of Valance's vehicle was constitutional in light of the consents they had obtained. Initially, we note that Valance has come forward with no case clearly establishing as of May 28, 1995, that a consent to search would be deemed involuntary in circumstances similar to those here. More importantly, our own case law did not clearly establish by that date that Valance's oral and written consents were invalid. Indeed, prior to May 28, 1995, we had affirmed lower court findings of a voluntary consent in circumstances where the evidence of duress or coercion was as strong or stronger than that relied on by Valance here. *See, e.g., United States v. LaGrone,* 43 F.3d 332, 334 (7th Cir.1994) (nineteen-year-old voluntarily consented to search of grocery store where officers (two of whom had been wearing raid masks) had entered store with weapons drawn, had held the defendant in custody for fifteen minutes prior to obtaining consent, and had asked more than once whether the defendant would consent to a search of the store); *United States v. Taylor,* 31 F.3d 459, 463 (7th Cir.1994) (consent deemed voluntary where eight officers had appeared at the defendant's place of business with weapons drawn, had ordered the defendant to lie face down on the ground, and had handcuffed him while conducting a protective sweep of the premises; coercive atmosphere had dissipated by the time the defendant consented to the search); *Kozinski,* 16 F.3d at 810 (consent deemed voluntary where agents had entered the defendant's home with an arrest

warrant, one of the agents had held a gun to the defendant's side for the first few minutes of the arrest, and the agent had then holstered her gun after the defendant was handcuffed but before he provided written consent); *United States v. Rojas,* 783 F.2d 105, 107–10 (7th Cir.) (consent deemed voluntary where seven officers had come to the defendant's apartment to arrest him, had displayed their weapons upon arrival, had taken the defendant into custody, had handcuffed him, and had then sequestered him in a small bathroom before requesting his consent), *cert. denied,* 479 U.S. 856, 107 S.Ct. 195, 93 L.Ed.2d 127 (1986). In light of these decisions, a reasonable officer in the position of these defendants could have believed that his conduct was lawful. Defendants Wisel, Reneau, Pearce, Balliet, and Werkheiser are therefore entitled to qualified immunity on this aspect of Valance's claim.

### D.

■ We turn finally to Valance's Fourth Amendment claim against Deputy Sheriff Rice, who is alleged to have effected an unlawful seizure when he photographed Valance and his vehicle. Valance makes clear in his brief that he is not asserting a constitutional right to be free from having his picture taken; his claim instead is that he had a Fourth Amendment right not to be detained further while this was occurring. (Valance Br. at 14.) That claim too must fail, however, because Valance has come forward with no evidence indicating that Rice's actions caused him to be further detained. The Garrett police officers already were detaining Valance for the purpose of searching his vehicle when Rice arrived on the scene. There is no evidence that those officers had completed their search and were prepared to release Valance before Rice finished taking his photographs. Thus, there is no evidence that Rice's actions in any way detained Valance. We therefore need not determine whether Rice's suspicion that Valance may previously have impersonated a police officer was sufficient to support a further detention, or whether Valance voluntarily consented to that detention.

### III.

For the foregoing reasons, the district court's judgment in favor of all defendants is

AFFIRMED.