**Marie BOSLEY, Plaintiff,**

v.

**RUSH PRUDENTIAL PLANS, Defendants.**

**No. 98 C 6150.**

United States District Court, N.D. Illinois, Eastern Division.

Sept. 16, 1999.

Armand L. Andry, Law Offices of Armand L. Andry, Oak Park, IL, for Marie S. Bosley, plaintiff.

Sally J. McDonald, Tracy Lee Bradford, Rudnick & Wolfe, Chicago, IL, for Rush Prudential Health Plans, defendants.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Marie Bosley sues Defendant Rush Prudential Plans ("Rush") for race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981. Ms. Bosley alleges that Rush discriminated against her because of her race by terminating her as Medical Office Administrator ("MOA"). Currently before the Court is Rush's motion for summary judgment. Because Ms. Bosley cannot establish a prima facie case of race discrimination or demonstrate that Rush's reason for terminating her was pretextual, Rush's motion is granted.

## FACTUAL BACKGROUND

The following undisputed facts are taken from the parties' Local General Rule 12 statements of material facts and accompanying exhibits.[1] Rush administers ten

---

1. Local Rule 12(N)(3) requires a non-moving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. This Court previously granted in part Defendant's motion to strike portions of Plaintiff's 12(N) statement for failing to comply with Local Rule 12(N)(3).

medical offices throughout the Chicagoland area. Ms. Bosley began working at Rush's Coleman facility as a part-time staff nurse in 1991. Her supervisor, MOA Deborah Taylor, was impressed by Ms. Bosley's performance and quickly promoted her full-time staff nurse.

In October of 1995, Taylor received a promotion and recommended Ms. Bosley to fill her position as Coleman's acting MOA. This was the first time Ms. Bosley was responsible for administrating a medical facility. Shortly thereafter, Mary Ryan (Caucasian), Rush's Regional Director,[2] recommended that Ms. Bosley serve as Coleman's permanent MOA. Jay Zerwekh, Rush's Vice President of Anchor Group Operations, expressed concern about Ms. Bosley's ability to handle the permanent MOA position based upon Ms. Bosley's performance as acting MOA. Ryan agreed to interview other candidates, but ultimately hired Ms. Bosley as Coleman's MOA.[3]

As MOA, Ms. Bosley was responsible for directing Coleman's day-to-day operations, and worked closely with Dr. Gail Floyd (African American), Coleman's Office Medical Director ("OMD"). In January 1997, Rush created a multi-disciplinary focus group to analyze ways to improve health care delivery at Rush's medical offices (the "synergy project"). The group developed a work plan for each office, and Ms. Bosley was largely responsible for ensuring that the Coleman office achieved its synergy goals.

In March 1997, Ryan conducted Ms. Bosley's 1996 performance review. The review was divided into three components: the "Key Results" section was the tradi-tional performance appraisal; the "Core Skills and Values" section focused on the knowledge and skills required for the position; and the "Goals" section focused on the employee's career goals and job satisfaction. The Key Results section assessed performance as "exceeds expectations", "meets expectations", or "below expectations" in eight different areas. The Core Skills and Values section rated MOAs as "exceeds all expectations", "exceeds some expectations", "fully meets expectations", "partially meets expectations", or "fails to meet expectations" in nine different areas.

In comparison to the other MOA's that Ryan evaluated in 1997, Ms. Bosley and Joan Foulk (Caucasian) received the lowest performance assessments: both women received only one "exceeds/meets expectations" rating; five "meets expectations" ratings; and two "meets/below expectations" ratings in the Key Results section. The four other MOA's Ryan rated each received none at least one "exceeds expectations" ratings, and one received a "meets/below expectations" rating or lower. Both women also received the lowest assessments in the Core Skills and Values section. In January 1998, Joan Foulk resigned from Rush to avoid termination.

Prior to Ms. Bosley's review, Ryan discussed Ms. Bosley's performance with Dr. Floyd. Although Dr. Floyd recommended terminating Ms. Bosley due to poor performance, Ryan hoped that Ms. Bosley's performance would improve with time. Although Coleman's staff were receptive to Ms. Bosley, Dr. Floyd's opinion of Ms. Bosley never improved. To the contrary, Dr. Floyd believed that Ms. Bosley was

**2.** For a short time, Ryan was temporarily .assigned to the Provider Services Department and was later promoted to Zerwekh's Vice President position. At all relevant times, however, Ryan was Bosley's supervisor.

**3.** In January 1998, the Coleman office relocated from 99th and Halsted in Chicago, to the Evergreen Plaza, at 95th and Western in Evergreen Park, Illinois. For the sake of clarity, the Court will refer to both facilities as the Coleman facility. We acknowledge that Ms. Bosley insinuates that the move itself was discriminatory because the facility was no longer named after Coleman, a prominent African American attorney, and that, unlike the old facility, the new facility was not located in a predominantly African American neighborhood, even though the clientele was predominantly African American. However, because Ms. Bosley makes no attempt to explain how this violates Title VII or § 1981, there is no need for the Court to differentiate between the two facilities.

responsible for serious patient-scheduling conflicts. In August 1997, Dr. Floyd again recommended that Ryan terminate Ms. Bosley. On November 12, 1997, Dr. Floyd, Ryan, and Dr. Weisbart met with Ms. Bosley to discuss Coleman's continuing patient-scheduling problems identified during the synergy project. Ms. Bosley acknowledges that Floyd, Ryan, and Weisbart attributed these problems to her. Ms. Bosley, however, attributed many of Coleman's shortcomings to Dr. Floyd, and maintained that Dr. Floyd was also responsible for implementing the synergy goals.[4]

From January through March of 1998, Ryan tracked each office's synergy progress in preparation for the MOAs' annual review. For twenty-four areas identified during the synergy project, Ryan evaluated each office on a scale of (little or no goal implementation) to 3 (complete goal implementation). The Coleman Office received dismal scores, rating marks of 1 to 1.5 in eleven different categories—the highest number of low marks received by any Rush office. These deficiencies were attributed, largely, to Ms. Bosley.

In February 1998, Ryan met with Dr. Floyd to discuss Ms. Bosley's second review. Once again, Dr. Floyd recommended terminating Ms. Bosley. Just prior to Ms. Bosley's review, Dr. Floyd composed a memo documenting Coleman's failure to improve patient and doctor scheduling problems, noting that "[t]here is nothing in this memorandum that has not been discussed ad nauseam with the [Coleman] staff [—] it is the implementation that is lacking."

Nevertheless, Ryan testified that she was not prepared to terminate Ms. Bosley at the time of Ms. Bosley's review. In her 1998 Review, Ms. Bosley received the lowest marks of the seven MOAs that Ryan rated: she received only one exceeds expectations rating, but two below expectations ratings. Debra Stade–Donar's (Caucasian) reviews were similarly disappointing: Ryan gave Donar only one "exceeds/meets expectations" rating, but two "meets/below expectations" ratings. Bosley received the lowest marks of all MOAs rated in the Core Skills and Values section. Also, Donar's review also notes that Donar was relatively new to the position, and that she had not yet received formal orientation training. At the time of her deposition, Ryan stated that Rush was in the process of firing Donar.

Ryan agreed that Ms. Bosley's performance was unacceptable and that termination was probably unavoidable, but believed that Ms. Bosley could continue as Coleman's MOA if she exhibited "an heroic change" in her management style. Ryan left the Goals section of Ms. Bosley's evaluation blank so the two could develop Ms. Bosley's goals together at the review session.

Ryan contends that, at the review session, it quickly became apparent that Ms. Bosley could not make the necessary transformation. Ryan testified that started the meeting by handing Ms. Bosley her evaluation, the employees' review, and Dr. Floyd's letter. Ms. Bosley's response, according to Ryan, was unacceptable: Ms. Bosley "did not accept responsibility for any of the issues. She was combative. She was adversarial. She was very difficult. She was uncooperative. There would have been no value in talking about another position that day...." Ryan claims that it was impossible to discuss

---

4. In support of her position that Dr. Floyd was responsible for implementing synergy goals, Ms. Bosley refers to (unauthenticated) documents that list both Ms. Bosley and Dr. Floyd under the headings "Physician Practice Style Group" and "Referrals Group", Ms. Bosley is also listed under four of the six other project headings. We fail to see how evidence demonstrating that both Dr. Floyd and Ms. Bosley were equally responsible for two of the synergy goals, and that Ms. Bosley was responsible for four additional synergy goals contradicts Defendant's statement that Ms. Bosley was primarily responsible for implementing the synergy goals. In addition, it does little to contradict Defendant's Exhibit 2, showing Ms. Bosley as responsible for most synergy project goals.

Ms. Bosley's weaknesses and the path to improvement because Ms. Bosley kept "talking over" Ryan. Faced with no prospect for improvement, Ryan terminated Ms. Bosley at the review.

Ms. Bosley's version of the March 10, 1998 review session differs slightly. In her affidavit, Ms. Bosley described the session as follows:

> I was given my performance review which [Ryan] had prepared, a memo written by Dr. Gail Y. Floyd dated March 9, 1998, and a copy of a summary of reviews done by Coleman .. physicians and employees. I read Ms. Ryan's review first and was totally shocked to find that she had evaluated my performance in such a manner in spite of all the obstacles I had worked around and the major accomplishments I had made since March '97 to March '98. In addition, the reviews by the physicians and employees were positive and in total disagreement with her assessment. The memo written by Dr. Floyd was so vague that it was hard for me to determine what she was saying. I noted immediately that there were no goals for upcoming year [sic], no observations, or suggestions for improvement on my written evaluation by Ms. Ryan. According to [Rush's] Performance Review Guidelines the review is to always complete these areas prior to meeting with employee [sic] so they can be discussed with the employee during the review. Ms. Ryan had no tablet or other papers in her presence or on the table and set [sic] with her arms folded. She commented that Dr. Floyd had discussed her memo with me already. I advised her that I had not spoken with Dr. Floyd as I was not in the office on March 9th and I had never seen the memo nor had Dr. Floyd had a discussion with me. She sighed heavily, and stated 'Gail told me she had discussed this with you.' I replied to her, 'well both of us know how Dr. Floyd stretches the truth.' At this point Ms. Ryan said nothing, so I asked the question what does this mean? She replied, you can no longer be the MOA at [Coleman] and we have to look for alternatives. I questioned what were the alternative? She replied, 'well I would like for you to continue on as MOA and we will start a search for your replacement and then give you a severance package.' I quietly, and calmly told Ms. Ryan that I would not take a severance package from [Rush] because this was not the end of the issue. I mentioned that she had never complimented me on any of my accomplishments, disrespected me in front of staff that I supervised, and initiated many barriers for me as MOA. I concluded my brief conversation with her by offering her my office keys and pager and stating that she was my manger [sic] and there was no reason to debate her assessment. Contrary to the lie Ms. Ryan told in her deposition, there was no attempt on her part or my part to discuss performance issues item by item . . .

Rush offered Ms. Bosley's position to an African American employee who turned down Rush's offer. Rush ultimately hired a Caucasian employee as Coleman's MOA.

## ANALYSIS

### A. Summary Judgment Standards

Summary judgment is proper only when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). When ruling on a motion for summary judgment, the court must view all evidence in a light most favorable to the non-moving party, and draw all inferences in the non-movant's favor. *See Wolf v. Buss America, Inc.,* 77 F.3d 914, 918 (7th Cir.1996). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, if the evidence is merely colorable, or is not sufficiently probative, the court may grant summary judgment. *Id.* at 249–50, 106

S.Ct. 2505. Weighing evidence, determining credibility, and drawing reasonable inferences are jury functions, not a judge deciding a motion for summary judgment. *Id.* at 255, 106 S.Ct. 2505. These standards apply with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir.1994).

### B. Plaintiff's Discrimination Claim

■ Title VII of the Civil Rights Act of 1964 prohibits discrimination against any employee because of the individual's race or national origin. 42 U.S.C.A. § 2000e(2)(a)(1), 2000e(3)(a). "In examining [Ms. Bosley's] sec.1981 claim, we employ the same framework that we use with respect to Title VII claims." *Vakharia v. Swedish Covenant Hospital*, 190 F.3d 799, 806 (7th Cir.1999). There are two ways for a plaintiff to establish actionable discrimination: by presenting direct evidence of an illegal motive, *see Essex v. United Parcel Service, Inc.*, 111 F.3d 1304, 1308 (7th Cir.1997); or by utilizing the *McDonnell Douglas* burden-shifting analysis "to raise an inference of illegal motive." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Because Ms. Bosley has not produced any direct evidence that Rush violated Title VII or § 1981, her discrimination claim must satisfy *McDonnell Douglas* in order to survive summary judgment. *See Essex*, 111 F.3d at 1309.[5]

Under *McDonnell Douglas*, Ms. Bosley must first establish a prima facie case of discriminatory discharge. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. To establish a prima facie case of racial discrimination, Ms. Bosley must demonstrate that: (1) she is within a protected racial class; (2) she was meeting Rush's legitimate expectations; (3) she suffered an adverse employment action; and (4) she has evidence from which the Court can infer that the adverse action sprang from a "legally forbidden ground," such as more favorable treatment of similarly-situated, non-minority employees. *See Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158–59 (7th Cir.1996); *Taylor v. Canteen Corp.*, 69 F.3d 773, 779 (7th Cir.1995).

If Ms. Bosley succeeds in making her prima facie case, a rebuttable presumption of discrimination is created and the burden of production shifts to Rush to articulate a legitimate, non-discriminatory explanation for the adverse employment action. *See Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir.1994). If Rush succeeds, the presumption dissolves and the burden of production shifts back to Ms. Bosley to demonstrate that the proffered reason for the discharge is a pretext for racial discrimination. *Essex*, 111 F.3d at 1309. Ms. Bosley can establish pretext by showing either that discriminatory intent more likely than not motivated Rush, or that Rush's proffered explanation is "unworthy of credence" because the explanation has no basis in fact, is not the real reason for the adverse action, or is insufficient to justify any adverse action. *Collier v. Budd Co.*, 66 F.3d 886, 892 (7th Cir.1995).

Rush contends that summary judgment is warranted because Ms. Bosley cannot establish a prima facie case of discrimination. Specifically, Rush charges that Ms. Bosley was not meeting Rush's legitimate expectations and that Ms. Bosley cannot demonstrate that similarly situated persons outside of the protected class were treated more favorably.[6] Because we

---

5. In Plaintiff's response brief, she insinuates that there is direct evidence of discrimination. *See* Pl.'s Resp.Br. at 7–9. The Plaintiff does not direct the Court to this evidence and the Court's own review of the briefs and record does not reveal direct evidence of discrimination..

6. Ms. Bosley's response to Rush's motion is rather confusing: there is no separation between counsel's arguments regarding Rush's legitimate expectation, similarly situated MOAs, and pretext. In addition, counsel's brief is replete with conclusory assertions and random citation without any real application of the law to the facts of this case. For example, counsel has seen fit to quote Justice Thurgood Marshall's concurrence in *Castaneda v. Partida* 430 U.S. 482, 97 S.Ct. 1272, 51

agree that Ms. Bosley cannot establish a prima facie case of discrimination, we grant Rush's motion.

### 1. Ms. Bosley Was Not Meeting Rush's Legitimate Expectations.

Rush contends that Ms. Bosley was not meeting its legitimate expectations. This contention is well documented. Prior to her appointment as acting MOA, Ms. Bosley was a strong employee, but had no experience in supervising a large group of employees or a medical office. Perhaps due to her inexperience, Zerwekh labeled Ms. Bosley's acting MOA tenure ineffective and encouraged Ryan to find another candidate for the position. As Coleman's MOA, Ms. Bosley was on the receiving end of almost constant criticism from Dr. Floyd. For two consecutive years, Ms. Bosley received the lowest rating of all the MOA's Ryan evaluated. In Ms. Bosley's final 1997 evaluation, Ryan conceded that Ms. Bosley was committed to Rush, but believed that Ms. Bosley lacked the skills to be successful:

> "[Ms. Bosley] is personally a dedicated and hard working MOA who has high standards and strives to achieve them in all areas. However at the [Coleman] office, she is unable to accomplish the performance expected.... Given the challenges of this office the manager must have exceptional organizational and time management skills.... While [Ms. Bosley] has average to good organizational skills, they are not adequate at this office.... the performance of the office as a whole is less than it was before [Ms. Bosley] became the MOA."

Finally, as MOA, Ms. Bosley was responsible for ensuring that Coleman implemented synergy goals. According to Ryan's evaluation, the Coleman office was the least successful Rush facility with respect to achieving synergy goals.

Ms. Bosley contends that she must have been meeting Rush's legitimate expecta-

tions because she never received notice to the contrary; specifically, that she never received a formal written reprimand. Ms. Bosley then points to Rush's corrective action policy, which suggests that corrective actions available to a supervisor include verbal warnings, written reprimands, probation, suspension, and discharge. However, Ms. Bosley fails to account for Ryan's testimony that Ms. Bosley's dismal performance reviews, the November 12, 1997 meeting, and Dr. Floyd's ongoing criticisms sufficiently put Ms. Bosley on notice that her performance was deficient.

Ms. Bosley attaches a written reprimand to MOA Theresa Sinkowski from Regional Director Jannah Al–Uqdah, and Ms. Bosley's written reprimand to resource nurse Felecia Files, apparently to demonstrate proper disciplinary pro procedure. This argument ignores the wide discretion the corrective action policy affords to supervisors: "[a] discharge can occur for any reason ... notwithstanding anything contained in this policy or the use of any other corrective action" and that "discharge may be used at any time to address acts of employee job performance." Pl.'s Ex. B (Rush's Corrective Action Policy). There is simply no evidence that Ryan's failure to send Ms. Bosley a letter entitled "Formal Written Reprimand" or to suspend Ms. Bosley was a departure from well established office policy. The fact that Jannah Al–Uqdah and Ms. Bosley used formal letters to notify employees of deficiencies does not negate the notice Ms. Bosley received, via her performance reviews and Dr. Floyd's criticism, and does not change the fact that Ms. Bosley was not meeting Rush's legitimate expectations.

Ms. Bosley then offers this conclusory argument:

> Plaintiff has shown how the same defects allegedly possessed, failure to implement synergy requirement [sic], patient scheduling, problems with per-

L.Ed.2d 498 (1977) for almost two pages without any analysis as to how it impacts the

outcome of this case.

sonnel management and turnover, were glossed over in evaluations of Caucasian MOA's and was [sic] never grounds for termination, particularly without warning and without a demotion or reassignment. Plaintiff's 12(N) Statement painstakingly contrast [sic] how differently Mary Ryan viewed the defects of Caucasians as opposed to her defects. Caucasian MOA's who needed improvement were allowed to do so. Plaintiff was not. Plaintiff's 12(N) Statement makes it clear that the performance issues raised against Plaintiff were based on double standards employed by the Defendant.

Pl's Resp.Br. at 7. We note that Ms. Bosley's brief fails to identify when Ryan overlooked Caucasian MOAs' defects, which Caucasian MOAs performed poorly, which MOAs were allowed to improve and how they were allowed to do so, or any specific evidence of Defendant's alleged double standard.

■ Ms. Bosley's 12(N) statement, affidavit, and accompanying documentation are also deficient. Instead of setting forth factual information in a concise manner, Ms. Bosley's affidavit rambles in a conclusory fashion, rarely relying on admissible evidence, charging defendants discriminatory practices. Although Plaintiff's 12(N) Statement sets forth the evaluations of other MOAs, Plaintiff does not attempt to analyze this information. Plaintiff's counsel disregards Ms. Bosley's burden on summary judgment:

> Summary judgment is not a paper trial, the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide based on evidence of record, whether there is any material dispute of fact.... The parties in turn bear a concomitant burden to identify evidence that will facilitate this assessment.

*Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994); *Brasic v.*

*Heinemann's Inc.*, 121 F.3d 281, 285 (7th Cir.1997) ("It is not our task ... to scour the record in search of a genuine issue of triable fact"); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried in briefs.") Ms. Bosley's subjective and conclusory assertions that Rush relied upon a double standard is not evidence of discrimination. Similarly, the Court's review of Ryan's evaluations of the other MOAs does not evidence a discriminatory double standard. As such, we reject this argument as well.

Finally, Ms. Bosley argues that there is a "mosaic of evidence" that her performance was good, once again generally directing the Court her 12(N) statement without identifying this alleged evidence. We assume that Ms. Bosley is referring to her own assessment of her performance, her previous supervisor's positive review of her nursing performance, her employees' evaluations of her performance, and her belief that Dr. Floyd was actually responsible or Coleman's shortcomings and that Ryan unfairly blamed Ms. Bosley for Coleman's ongoing deficiencies.

■ An employee's subjective assessment of her performance does not create a genuine issue of fact as to the employer's contrary evaluation of the employee. *Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d 1106, 1114 (7th Cir.1998). Earlier performance evaluations, undertaken by a different supervisor and in regard to an entirely different position, do not demonstrate that Ms. Bosley was meeting legitimate expectations as MOA. *Id.* at 1113. Similarly, Ms. Bosley's coworkers' assessments and Dr. Floyd's role in Coleman's problems to be irrelevant— neither demonstrates that Ryan did not honestly believe that Ms. Bosley was in over her head as MOA. *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 891 (7th Cir. 1997); *Anderson v. Stauffer Chem. Co.*, 965 F.2d 397, 401 (7th Cir.1992) (if the defendant honestly believed that the em-

ployee was not meeting legitimate expectations, termination is justified).

In short, Ms. Bosley has not come forward with evidence that she was meeting Rush's legitimate expectations. At best, Ms. Bosley's evidence indicates that Ryan may have unfairly, but honestly, credited Dr. Floyd's assessment of Ms. Bosley's abilities or blamed Ms. Bosley for Dr. Floyd's shortcomings. This is not evidence of discrimination. *See Bibbs v. Board of Trustees for University of Illinois*, 9 F.Supp.2d 964, 970 (N.D.Ill.1998). Therefore, Ms. Bosley cannot establish the second prong of her prima facie case, and summary judgment in favor of Rush is appropriate.

### 2. Similarly Situated Workers Were Not Treated Differently

 Even if Ms. Bosley could establish that she was meeting Rush's legitimate expectations, she has not presented evidence that similarly situated workers outside of the protected class received more favorable treatment. During Ms. Bosley's MOA tenure, only two employees [7] received reviews comparable to her own: Joan Foulk's 1996 review and Debra Stade–Donar's 1997 review. Neither Foulk or Donar are still employed with Rush and, although the evidence is sparse, both women were forced to leave Rush because their performance was deficient. At her deposition Ryan testified that Rush was in the process of terminating Donar and that, in January 1998, Foulk resigned rather than face termination. Ms. Bosley

has not introduced any evidence to contradict this testimony. Rush apparently afforded all three women two years to settle into their role as MOA.[8] When they did not do so, all three women were forced to leave.

Ms. Bosley also submitted Elaine Velutis' 1994 evaluation, which documents deficiencies similar to Ms. Bosley's. We note that this review took place long before the synergy project, and the areas reviewed are not identical. More importantly, Velutis received this review in early 1995 and was laid off on February 3, 1995. This is consistent with Ryan's treatment of Ms. Bosley—both were underperforming MOAs forced to leave their positions.

Interestingly, Ms. Bosley does not argue that Foulk and Velutis received better treatment because, even though they left Rush, they were not fired—Foulk resigned prior to her review and Velutis was laid-off shortly after her review. Although Ryan claims that she offered to allow Ms. Bosley to resign, Ms. Bosley denies that Ryan ever made such an offer. We need not determine (particularly in the absence of briefing) if this creates a genuine issue of material fact as to the fourth prong of Ms. Bosley's prima facie case because she has not introduced evidence that she was meeting Rush's legitimate expectations and she has not demonstrated pretext.

### 3. Pretext

 Summary judgment is further required because Rush has proffered a legiti-

---

7. We reject Ms. Bosley's attempt to show that other MOAs were similarly situated by pointing to isolated negative remarks in their evaluations. For example, Ms. Bosley highlights negative remarks that Ryan made in Sinkowski's 1996 performance review, and notes that Sinkowski was not removed from her position. Sinkowski is not similarly situated to Ms. Bosley, however, because Sinkowski's review is markedly better than either of Ms. Bosley's—Sinkowski received one "exceeds expectations" ratings, and no "meets/below expectations" or "below expectations" ratings in the Key Results section. In her combined reviews, Ms. Bosley received two "meets/below expectations" ratings and two "below expectations" rating. Although Ms. Bosley received multiple "fails to meet expectations" ratings in the Cores Skills and Values section, Sinkowski received none, rating only one "partially meets expectations" assessment.

8. Foulk received her 1996 review in 1997 and resigned in 1998, prior to receiving her 1997 review. Foulk's 1996 review references problems that she "inherited"—indicating that she was new to the position. Similarly, Donar was reviewed for 1997 and terminated after her 1998 review. Because Donar's 1997 review states that "Debra is a relatively new manager," we assume that 1996 was her first year in the position.

mate explanation for her termination and Ms. Bosley has not demonstrated that Rush's reason is pretextual. Rush claims that it terminated Ms. Bosley for poor performance. In response, Ms. Bosley points to Ryan's testimony that she was not prepared to terminate Ms. Bosley going into the March 10, 1998 evaluation, but that Ms. Bosley's behavior during the evaluation convinced Ryan that termination was warranted. Because Ryan and Ms. Bosley offer conflicting accounts of the March 10, 1998 evaluation, Ms. Bosley argues, there is a genuine issue of material fact that precludes summary judgment. We disagree, finding that the alleged differences in their testimony are immaterial.

Ryan testified that Ms. Bosley was terminated because her performance was deficient, that absent a "heroic change" in her management style Ms. Bosley could not continue as MOA, and that during her review Ms. Bosley convinced Ryan that this change was not forthcoming. Regardless of whether Ryan's perception of Ms. Bosley as combative was accurate or Ms. Bosley's subjective belief that she was calm was correct, Ms. Bosley's account does not contradict Ryan's testimony that Ryan became convinced that Ms. Bosley was not capable of the heroic change Ryan believed was necessary for Ms. Bosley's continued employment. *See Valance v. Wisel,* 110 F.3d 1269, 1275–76 (7th Cir. 1997) (plaintiff's testimony that he didn't cross the center traffic line, and thus that there was no probable cause for a traffic stop, established only what the plaintiff believed and did not cast doubt what the officer reasonable believed). Ms. Bosley's testimony reveals that she disagreed with Ryan's assessment, she insulted Dr. Floyd, and resigned herself to the belief that there was nothing Ms. Bosley could do to change Ryan's mind. Ms. Bosley's account does not portray an employee willing to embrace responsibility for her shortcomings and improve her management style. Therefore, we find that Ryan's and Ms. Bosley's perception of the review session are materially consistent and do not demonstrate pretext. *See Valance,* 110

F.3d at 1274 (immaterial disputes of facts are insufficient to defeat a motion for summary judgment).

Ms. Bosley then argues that Rush's conflicting testimony as to who was responsible for terminating her demonstrates pretext. Once again, we disagree. The evidence shows that Rush repeatedly asserted that Ryan terminated Ms. Bosley, that she would not have done so if Dr. Floyd did not believe termination was warranted, and that Dr. Floyd recommended terminating Ms. Bosley. The testimony of Barabara Hill, Rush's president and CEO, establishing that Ryan, not Floyd, would have the authority to effect Ms. Bosley's termination supports, not contradicts, Rush's explanation.

Although only tangentially related to the issue of pretext, Ms. Bosley also asserts that Rush is not entitled to an inference of nondiscriminatory intent because Ryan (Caucasian) terminated her—not Floyd (African–American). Rush need not rely on such an inference to carry the day, and, in any event, Ryan promoted Ms. Bosley to MOA. The Seventh Circuit has held that when the same decision maker that hired a plaintiff is alleged to be the discriminator, an inference of non-discrimination arises. *EEOC v. Our Lady of the Resurrection Med. Ctr.,* 77 F.3d 145, 148 (7th Cir.1996) (noting that the plaintiff failed to present evidence sufficient to overcome the inference of nondiscrimination because a person who intends to discriminate against minorities is unlikely to hire them or let them stay on working in the first place). As such, it is irrelevant, for purposes of this inference, whether Ryan or Floyd terminated Ms. Bosley.

## CONCLUSION

The undisputed facts show that during her seven years with Rush, Ms. Marie Bosley was dedicated and hard working. Ms. Bosley's coworkers, subordinates, and many of the doctors she worked with testified to her virtues. However, the evidence

also demonstrates that Mary Ryan, while aware of Ms. Bosley's contributions, was honestly convinced that Ms. Bosley lacked the skills to properly manage the Coleman facility. Although we might be inclined to reassign, as opposed to terminate, a valuable employee, the Court's role is not to reexamine this decision:

> [Courts do not] sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [the federal antidiscrimination laws do] not interfere. Rather, [the] inquiry is limited to whether the employer gave an honest explanation for its behavior.

*McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992). Instead, this Court must determine whether the decision may have been made because of Ms. Bosley's race.

Because Ms. Bosley has failed to establish a prima facie case of discrimination or demonstrate that Rush's reason for terminating her were pretextual, Defendant's motion for summary judgment [19–1] is granted. Simply put, Ms. Bosley has not presented admissible evidence demonstrating a disputed issue of material fact which would require a jury trial. The Clerk of the Court is directed to enter judgment, pursuant to Fed.R.Civ.P. 58, in favor of Defendant and against Plaintiff.