In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3752

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

PAUL T. RAIBLEY,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois.
No. 98 CR 40058--Joe B. McDade, Chief Judge.

Argued March 31, 2000--Decided March 21, 2001

Before POSNER, RIPPLE, and ROVNER, Circuit Judges.

ROVNER, Circuit Judge.  Police stopped Paul Raibley for questioning after he was seen surreptitiously videotaping a seventeen year-old Wal-Mart employee. A consensual search of his pickup truck produced a small quantity of marijuana and two videotapes. The police later took a look at the tapes, purportedly with Raibley's consent, and discovered pornographic scenes on one of the tapes involving two young girls. After unsuccessfully moving to suppress the videotapes and other evidence obtained as a result of the investigatory stop, Raibley pleaded guilty to the production of child pornography, in violation of 18 U.S.C. sec. 2251(a), (d). He appeals, contending that the police lacked grounds on which to stop and question him under Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968), and that they also lacked his consent to view the videotapes. We affirm.

I.

Aledo, Illinois is a town of about 4,000 people, situated approximately ten miles east of the Mississippi River and some twenty miles south of the Quad-Cities area. On October 10, 1998, the manager of the Aledo Wal-Mart store saw a man, later identified as Raibley, sitting in a small, white pick-up truck in the store's parking lot,

covertly videotaping a seventeen year-old store worker as she walked across the lot. When Raibley realized he had been noticed, he drove away in a hurry. The police were summoned.

Local police officer Eric Lindburg arrived and spoke with the store manager. In addition to the facts just described, Lindburg ascertained that, so far as the store manager knew, Raibley was a stranger to the young woman he had been videotaping. In fact, the subject of the taping had not even realized what was happening. The manager supplied Lindburg with a description of Raibley as well as a license plate number, "FIN 98." A check on the plate number yielded no information. Lindburg left the store and began to drive around town hoping to locate the pickup truck.

About 30 minutes later, Lindburg returned to the Wal-Mart and spotted an unoccupied white pickup truck in the parking lot bearing the license plate number "FINS 98". Lindburg ran a check on that plate number and learned that the truck was registered to a man in Collinsville, Illinois (near St. Louis). Leaving his marked patrol vehicle parked in full view near the front of the store, Lindburg walked inside to ask the manager whether anyone had seen Raibley. While he was speaking with the manager, Lindburg looked outside and saw the white pickup leaving the lot at some thirty to forty miles per hour. Lindburg ran back to his car and radioed for help in stopping the truck, exclaiming, "He's taking off from me. He's westbound on Route 17."

Mercer County Sheriff's Deputy Sean Hast heard Lindburg's broadcast and intercepted the truck at a four-way stop in downtown Aledo, a mile or so away from the Wal-Mart. Believing that Raibley was wanted for fleeing and eluding a police officer, Hast had Raibley out of the truck and spread-eagled against the vehicle, and was about to place him in handcuffs, when Lindburg arrived a few moments later. Lindburg informed Hast that he only wanted to question Raibley. An embarrassed Hast apologized to Raibley and left the scene. Lindburg advised Raibley that he was not under arrest. When Lindburg asked him whether he would mind pulling his truck into a parking space around the corner so that the officer could speak with him further, Raibley responded, "No problem." Lindburg would later testify that he wanted to question Raibley because he believed that Raibley had committed the state offense of stalking when he surreptitiously videotaped the young Wal-Mart employee. See 720 ILCS 5/12-7.3.

Raibley moved his truck as requested, and Lindburg parked next to him. Both men then got

out of their vehicles. Lindburg asked him why he had been videotaping young women at the Wal-Mart. Raibley answered that he had gone to the store to purchase some goods for a birthday party he was attending, had noticed a pretty young girl, and decided to tape her. He did that sometimes, Raibley told the officer, although he knew it was wrong.

Lindburg's attention turned to the truck. He asked Raibley whether there was anything illegal in the truck. Raibley said there was not, that "all he had was some videotapes." Suppr. Tr. 22. Lindburg then solicited Raibley's consent to search the truck, and Raibley gave it. Hast returned to the scene at Lindburg's request and stood by, watching Raibley, while Lindburg searched the truck. Inside of an open black bag on the passenger seat, Lindburg discovered a film canister containing what appeared to be marijuana. Lindburg proceeded to place Raibley under arrest.

Once Raibley was in handcuffs and apprised of his rights, Lindburg completed the search of his truck. He found a "hitter pipe" (a device used to smoke cannabis), some women's underwear, a pornographic magazine, a video camera, and two mini-VHS videotapes, one of the cases for which had been marked "Aledo girls."

Lindburg inquired as to the subject of the tapes, and Raibley told him that they contained, inter alia, scenes from a fishing trip. When Lindburg asked whether the tapes contained any pornography, including child pornography, a nervous Raibley said that they might contain footage of him having sex with adult females. Suspecting that the tapes might contain child pornography, Lindburg used his cellular telephone to contact Mercer County State's Attorney Baron Heintz and ask whether he could view the tapes. Heintz advised Lindburg that he could look at the tapes so long as Raibley did not object. Lindburg again asked Raibley whether the tapes contained any adult or child pornography, and Raibley told him that there was "nothing on there" except for footage of himself with his girlfriend. Suppr. Tr. 34. Lindburg said that he would like to take a look at the tapes anyway. In response, Raibley "just kind of looked away and shrugged his shoulders." Id. Lindburg interpreted this as an expression of consent. Id.

At the Mercer County Sheriff's office, where Raibley was booked on charges of possessing marijuana and drug paraphernalia, Lindburg began to view the videotapes. He looked at the tape labeled "Aledo girls" first. It contained footage of the seventeen year-old Wal-Mart employee as

well as other young women Raibley had filmed at the Wal-Mart. It did not contain any pornographic material, however.

Before Lindburg looked at the second tape, a jail employee informed him that Raibley wished to speak with him. Lindburg recounted his ensuing conversation with Raibley as follows:

Mr. Raibley told me that if I was wanting to view those tapes he really didn't want, you know, he just wanted me to see them. He didn't want a whole audience to see them, because he said it had pornography of him and his girlfriend on there. So he was going to--he wanted me to bring the camera back to him so he could show me how to view the tape just inside the camera.

Suppr. Tr. 37. Lindburg declined Raibley's offer, assuring him that only he and another officer would look at the tapes. According to Lindburg, Raibley acknowledged that he had "a problem," id., but said that he only intended to view the tapes while masturbating. During this discussion, Raibley also indicated that he had sped away from the Wal-Mart on the second occasion, when Lindburg was present, because he had overheard the officer make inquiries about "the guy that was videotaping." Suppr. Tr. 38.

When Lindburg left Raibley and reviewed the second videotape, he discovered that it contained scenes of two girls, later determined to be ages five and seven. These scenes included close-ups of their buttocks and breasts; and an adult hand could be seen in one of the scenes drawing back the underwear of one of the girls to expose her genitals. Lindburg observed that the wristwatch on the adult hand looked like the watch that Raibley was wearing. In subsequent interviews, Raibley disclosed the identities of the two girls, admitted that he had made the tape, and admitted that he had transported the tape across state lines.

After he was indicted for the production of child pornography, Raibley moved to suppress the videotapes and other physical evidence that Lindburg had seized, as well as his post-arrest statements. Raibley argued, inter alia, that the initial stop effectuated by Hast and Lindburg was not supported by a reasonable suspicion that he had committed a crime. See Terry v. Ohio, supra, 392 U.S. at 21-22, 88 S. Ct. at 1880. He further argued that, because Lindburg had not obtained a warrant authorizing him to view the tapes taken from Raibley's truck, see Walter v. United States, 447 U.S. 649, 100 S. Ct. 2395 (1980) (plurality), the review of those tapes was unlawful--unless Raibley had given Lindburg

permission to look at the tapes. Raibley contended that there was insufficient proof that he did give his consent.

The district court conducted an evidentiary hearing, and at the conclusion of that hearing, Judge McDade concluded that the stop of Raibley's vehicle and the review of the videotapes found within were both lawful. He concluded, in the first instance, that the initial detention of Raibley "was a legitimate Terry stop." Suppr. Tr. 213. As for the videotapes, Judge McDade found that Raibley had given his consent to view the tape that contained the pornography. He made that finding based on the shrug that Raibley had given when Lindburg indicated his desire to view the two tapes found in the truck, coupled with Raibley's subsequent request, made before Lindburg looked at the second, pornographic tape, that Lindburg view the tapes privately on the camera monitor. Suppr. Tr. 213-14.

II.
A.

Our review of the district court's decision to deny Raibley's motion to suppress is plenary. Ornelas v. United States, 517 U.S. 690, 699, 116 S. Ct. 1657, 1663 (1996). Of course, in the absence of clear error, we defer to the district court's findings of historical fact as well as its credibility assessments. Ibid. But the ultimate determination of whether the authorities violated the defendant's Fourth Amendment rights is one that we review de novo. Ibid.

The parties agree that the initial stop of Raibley's vehicle amounted to an investigatory stop of the kind described in Terry v. Ohio, supra. Terry held that a police officer may stop and briefly detain a person for questioning if he reasonably suspects "that criminal activity may be afoot." 392 U.S. at 30, 88 S. Ct. at 1884-85; see id. at 21-22, 88 S. Ct. at 1880; see also Illinois v. Wardlow, 528 U.S. 119, 123, 120 S. Ct. 673, 675 (2000); United States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (1989). A Terry stop does not demand the probable cause that an arrest would require--that is, the circumstances need not establish a "fair probability" that the person detained for questioning has committed a crime. See Sokolow, 490 U.S. at 7, 109 S. Ct. at 1585, quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983). On the other hand, the police may not stop an individual for questioning based on nothing more than an "inchoate and unparticularized suspicion or 'hunch.'" Terry, 392 U.S. at 27, 88 S. Ct. at 1883. "[T]he Fourth Amendment requires at least a minimal level of

objective justification for making the stop." Wardlow, 528 U.S. at 123, 120 S. Ct. at 676, citing Sokolow, 490 U.S. at 7, 109 S. Ct. at 1585. Simply put, the officer must have reasonable suspicion, supported by "specific and articulable facts," that an individual has committed, is committing, or is about to commit, a crime. Terry, 392 U.S. at 21, 88 S. Ct. at 1880; see also, e.g., United States v. Brown, 188 F.3d 860, 864 (7th Cir. 1999).

As we have noted, Officer Lindburg testified that he had Raibley stopped for questioning because he suspected that Raibley had committed the offense of stalking, in violation of Illinois law. The Illinois legislature has defined the offense of stalking as follows:

(a) A person commits stalking when he or she, knowingly and without lawful justification, on at least 2 separate occasions follows another person or places the person under surveillance or any combination thereof and:

(1) at any time transmits a threat to that person of immediate or future bodily harm, sexual assault, confinement or restraint; or

(2) places that person in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement or restraint.

. . .

(d) For the purpose of this Section, a defendant "places a person under surveillance" by remaining present outside the person's school, place of employment, vehicle, other place occupied by the person, or residence other than the residence of the defendant.

(e) For the purpose of this Section, "follows another person" means (i) to move in relative proximity to a person as that person moves from place to place or (ii) to remain in relative proximity to a person who is stationary or whose movements are confined to a small area. "Follows another person" does not include a following within the residence of the defendant.

. . . .

720 ILCS 5/12-7.3. Raibley contends that at the time he was detained, the facts known to Lindburg did not establish any of the elements of stalking as Illinois has defined that offense: there was, for example, no indication that Raibley had followed or surveilled the seventeen year-old Wal-Mart employee he was seen video-taping on more than one occasion.

We readily agree with Raibley that the facts known to Lindburg did not, standing alone, establish a violation of the stalking statute. But Terry does not require proof that a crime has occurred; it demands only such facts as are necessary to support a reasonable suspicion that a crime may have occurred. See Wardlow, 528 U.S. at 123, 120 S. Ct. at 675-76; Sokolow, 490 U.S. at 7, 109 S. Ct. at 1585. After all, the purpose of a Terry stop is not to accuse, but to investigate. Even facts susceptible of an innocent construction will support the decision to detain an individual momentarily for questioning, so long as one may rationally infer from "the totality of the circumstances--the whole picture," United States v. Cortez, 449 U.S. 411, 417, 101 S. Ct. 690, 695 (1981), that the person may be involved in criminal activity, see Sokolow, 490 U.S. at 9-10, 109 S. Ct. at 1586-87.

Based on what Lindburg learned when he first interviewed the Wal-Mart manager and other store employees, and when he returned to the store after searching the town of Aledo for Raibley's vehicle, we believe that Lindburg had a reasonable basis to suspect that Raibley may have been engaged in stalking. Lindburg knew that Raibley had covertly videotaped a young Wal-Mart employee. He also knew that the employee was not acquainted with Raibley and had not realized that Raibley was taping her. Having been oblivious to the videotaping, the employee experienced no apprehension of harm. Yet, she obviously had not consented to the videotaping. It was entirely possible, of course, that Raibley meant the subject of his videotaping no harm, nor even to put her in fear of such harm. On the other hand, Raibley's behavior was of a kind that could put a person in fear of harm, and the fact that he fled the Wal-Mart lot upon being noticed tended to belie an innocent motive. Moreover, a short while later, Raibley returned to the Wal-Mart store, a fact that was consistent with the possibility he might be following the subject of his videotaping. Finally, moments after Lindburg parked his cruiser in plain view near the store entrance, Raibley sped out of the lot for a second time. Unprovoked flight from a police officer is suggestive of wrongdoing, Wardlow, 528 U.S. at 124; 120 S. Ct. at 676, and coupled with the other facts we have noted supplied grounds on which to stop Raibley for questioning.

As Raibley points out, Lindburg did not actually know that Raibley was speeding away from the lot in response to the officer's presence. Lindburg had neither seen nor spoken to Raibley, and at that point in time the officer had no

information confirming that Raibley was even aware of his presence at the store. It was possible, therefore, that Raibley was simply in a hurry. And because the Wal-Mart lot was private property, Raibley's high rate of speed while leaving the lot broke no traffic laws.

Even so, one could reasonably have inferred that Raibley was fleeing in response to Lindburg's presence--as Raibley would later admit that he was. Lindburg had parked his cruiser near the store entrance, where it would have been visible to anyone entering or leaving the store. He had proceeded into the store to ask the manager whether she had seen "the guy who was videotaping" earlier. It was therefore quite likely that Raibley was aware of a police officer's presence. Raibley had already beat a speedy retreat from the parking lot once before, of course, when spotted by the store manager, and the fact that Raibley did so again at a fairly high rate of speed (30 to 40 miles per hour) upon Lindburg's return to the store was reasonably suggestive of flight rather than simple haste.

For these reasons, we conclude that the initial stop of Raibley's vehicle was justified under Terry. The district court's decision not to suppress the evidence gathered during Lindburg's subsequent questioning of Raibley and from the consensual search of his truck was therefore correct.

B.

The remaining question is whether Raibley gave Lindburg his consent to view the videotape that contained the evidence underlying the pornography charge. The parties agree that Raibley's consent was required under the circumstances of this case, and so we need not explore whether, in the absence of his consent, the police would have been entitled to view the tapes. See Walter v. United States, supra, 447 U.S. 649, 100 S. Ct. 2395 (plurality); United States v. Eschweiler, 745 F.2d 435, 440-41 (7th Cir. 1984), cert. denied, 469 U.S. 1214, 105 S. Ct. 1188 (1985). Whether an individual voluntarily consented to a search is a factual assessment that turns on the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S. Ct. 2041, 2047-48 (1973). Relevant factors include (1) the person's age, intelligence, and education, (2) whether he was advised of his constitutional rights, (3) how long he was detained before he gave his consent, (4) whether his consent was immediate, or was prompted by repeated requests by the authorities, (5) whether any physical coercion was used, and (6) whether the individual was in police custody when he gave his consent.

United States v. Strache, 202 F.3d 980, 985 (7th Cir. 2000); Valance v. Wisel, 110 F.3d 1269, 1278 (7th Cir. 1997). The government bears the burden of proving, by a preponderance of the evidence, that consent was freely and voluntarily given. Id. In this case, there is no claim that Raibley was somehow coerced into giving his consent to view the videotape. The question, rather, is whether he actually consented to the viewing or, at most, simply acquiesced to a show of authority. The latter is insufficient to demonstrate consent. Florida v. Royer, 460 U.S. 491, 497, 103 S. Ct. 1319, 1324 (1983).

In view of the factual nature of the consent determination, we review the district court's resolution of that question for clear error. E.g., United States v. Shelby, 121 F.3d 1118, 1120 (7th Cir. 1997), cert. denied, 524 U.S. 928, 118 S. Ct. 2325 (1998).

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 92 L.Ed. 746 (1948). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. Bessemer City, 470 U.S. 564, 574, 105 S. Ct. 1504, 84 L.Ed.2d 518 (1985). If the district court's account of the facts is plausible in light of the record viewed in its entirety, we may not reverse that decision even if we may have decided the case differently. See id. at 573-74, 105 S. Ct. 1504 (noting that if there are two possible understandings of the evidence, the factfinder's conclusion cannot be clearly erroneous); [citation omitted]. Furthermore, any reasonable doubts we may harbor should be resolved in favor of the district court's ruling "in light of its greater immersion in the case." Cook v. City of Chicago, 192 F.3d 693, 697 (7th Cir. 1999).

Central States, S.E. & S.W. Areas Pension Fund v. Kroger Co., 226 F.3d 903, 910 (7th Cir. 2000), amended in other respects, 2001 WL 204762 (7th Cir. Feb. 2, 2001), petition for cert. filed, No. 00-1304 (U.S. Feb. 14, 2001); see also, e.g., United States v. Denberg, 212 F.3d 987, 991 (7th Cir. 2000); United States v. Scheets, 188 F.3d 829, 836 (7th Cir. 1999), cert. denied, 528 U.S. 1096, 120 S. Ct. 837 (2000).

Although he believed that the question was close, see Suppr. Tr. at 211, Judge McDade concluded that Raibley did consent to Lindburg's review of the videotape. He based that finding on

Raibley's shrug of the shoulders when Lindburg solicited his consent, coupled with Raibley's subsequent request, at the jailhouse, that Lindburg view the tape on the camera monitor. Id. at 213-14. The judge did not believe that the shrug, without additional evidence, was sufficient to demonstrate Raibley's consent. Id. The judge found it significant, however, that Raibley later asked Lindburg to use the video camera to view the tape privately. Id. at 214. Judge McDade saw that request as evidence of Raibley's awareness that Lindburg was going to view the tape. Id. at 214. That awareness, in turn, suggested that Raibley had indeed meant to signal his consent to Lindburg by shrugging his shoulders. Id.

We find no clear error in the district judge's finding that Raibley consented to Lindburg's review of the tape. Like Judge McDade, we think that the question is a close one. Gestures are often ambiguous, and at least one court has concluded that a shrug without more is insufficient to show one's consent to search. State v. Harris, 642 A.2d 1242, 1246-47 (Del. Super. Ct. 1993). Other courts, however, have accepted shrugs and similar gestures as sufficient evidence of consent. E.g., United States v. Wilson, 895 F.2d 168, 172 (4th Cir. 1990) (defendant shrugged his shoulders and raised his arms when asked for consent to pat-down search); see United States v. Griffin, 530 F.2d 739, 742 (7th Cir. 1976) ("[t]he consent [to search] may be in the form of words, gesture, or conduct"), citing Robbins v. MacKenzie, 364 F.2d 45, 48-49 (1st Cir.), cert. denied, 385 U.S. 913, 87 S. Ct. 215 (1966). We need not decide whether a shrug alone would suffice as proof of consent, because, as Judge McDade pointed out, Raibley later called Lindburg to his cell and asked him to view the videotape privately. We believe that the shrug, coupled with the later request, permitted the inference that Raibley consented to the viewing.

As Raibley points out, he was incarcerated when he asked Lindburg to watch the tape on the video camera; moreover, Lindburg had told him that "we were going to be viewing the tape." Suppr. Tr. 89./1 But these circumstances did not compel a finding that Raibley acquiesced to a show of authority. Although Raibley was under arrest when Lindburg solicited his consent and incarcerated when he later spoke with Lindburg about viewing the videotape privately, these facts by no means preclude the notion that he consented voluntarily. See, e.g., Strache, 202 F.3d at 986. On neither occasion had Raibley been in custody for a lengthy period of time, and there is no evidence that Raibley was ever pressured or

badgered for his consent. So far as the record reveals, after its dramatic beginning, Lindburg's encounter with Raibley took place in a calm, professional manner. Lindburg had apprised Raibley of his constitutional rights when he took him into custody. Moreover, it was Raibley who summoned Lindburg to his cell to suggest that the officer look at the tape on the camera monitor. Although arguably susceptible to multiple interpretations, it is not unreasonable to construe that suggestion as confirmation that Raibley affirmatively consented to Lindburg's review of the tapes, and was concerned only that Lindburg not play the tapes before "a whole audience." Suppr. Tr. 37; see United States v. Price, 54 F.3d 342, 346 (7th Cir. 1995); United States v. Benitez, 899 F.2d 995, 998-99 (10th Cir. 1990). There is no evidence suggesting that Raibley knew that Lindburg had already watched the first of the two tapes by this time and was about to view the second--that the viewing was about to become a fait accompli, in other words. Raibley, whom the record reveals to have been an aquatic biologist who had published a number of scientific papers, obviously was a bright, mature individual. And there is no evidence that Raibley at any time voiced any objection to Lindburg's review of the tapes. See Forman v. Richmond Police Dep't, 104 F.3d 950, 960 (7th Cir.), cert. denied, 522 U.S. 997, 118 S. Ct. 563 (1997); Price, 54 F.3d at 346 (7th Cir. 1995).

Under these circumstances, we believe that Judge McDade was free to infer from Raibley's actions and words that he gave Lindburg his consent to watch the videotapes. The judge's decision to draw that inference is therefore not clearly erroneous.

III.

Having concluded that Officer Lindburg had an objectively reasonable basis on which to stop and question Raibley, and finding no clear error in the district court's finding that Raibley consented to the officer's review of the videotapes found in his truck, we AFFIRM Raibley's conviction.

/1 It is not clear from the record, however, whether Lindburg so informed Raibley before or after Raibley summoned Lindburg to ask the officer to view the tapes in private. See Suppr. Tr. 89.