In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2180

RONALD D. REHER,

*Plaintiff-Appellant,*

*v.*

FRANK VIVO, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:09-cv-02801—**Suzanne B. Conlon,** *Judge.*

ARGUED MARCH 29, 2011—DECIDED SEPTEMBER 7, 2011

Before ROVNER, WILLIAMS, and HAMILTON, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* An angry crowd accused Ronald D. Reher of videotaping their children in a public park. Police officers Marilyn Gabinski and Frank Vivo arrested Reher for disorderly conduct. The charges were eventually dropped and Reher sued the officers, claiming they arrested him without probable cause in violation of his Fourth Amendment rights. The district court entered summary judgment in favor of the officers. Reher now appeals.

We find that Gabinski had probable cause to arrest Reher because she was aware of suspicious circumstances surrounding Reher's conduct and his presence at the park that would justify an arrest for disorderly conduct. Whether Vivo had probable cause is a closer question because all Vivo knew at the time of the arrest was that the crowd was upset and that Reher had been accused of frequenting the park to film and look at the children. While we find that the information possessed by Vivo was too vague to give rise to probable cause to arrest Reher for disorderly conduct, we conclude that Vivo is entitled to qualified immunity because an officer in his position could have reasonably but mistakenly believed that there was probable cause. We affirm.

## I. BACKGROUND

Because we are reviewing the district court's entry of summary judgment against Reher, we recount the facts in the light most favorable to him. *See Grieveson v. Anderson*, 538 F.3d 763, 767 (7th Cir. 2008). On May 7, 2007, after a morning of fishing, hiking, and videotaping wildlife, Ronald Reher rode his bicycle to Edson Park in Lombard, Illinois. Edson Park is a small neighborhood park with a playground located behind two apartment buildings, one of them located at 1155 South Finley. In addition to his bicycle, Reher carried with him a bait bucket, a fishing pole, a video camera, a pair of binoculars, and a folding knife.

When Reher arrived at the park, there were about 15 to 20 people using it, including seven or eight children.

Reher sat on a bench and propped up his bicycle nearby. A few of the adults, including Reher's estranged seventeen-year-old daughter Ashley, started giving Reher strange looks. Reher claims that he did not recognize his daughter because he had not seen her in eight years.

After sitting in the park for about 30 minutes, Reher was approached by Ezeldra Outlaw. Outlaw is Ashley's mother. Outlaw and Reher were in a romantic relationship in 1990 and had lived together for a short time at 1155 South Finley. The relationship ended soon after Ashley was born. By May 2007, it had been four years since Reher had last seen Outlaw.

As Reher saw Outlaw approach, he claims that he pulled out his video camera and turned it on to film the encounter. Reher later stated in his deposition that he did so because, "I was pretty much just going to cover myself to make sure . . . if she said I threatened her, I have to have proof that I didn't."

According to Reher, Outlaw started yelling at him that he was "not supposed to be there." She then snatched the camera from his hands, threw it on the ground several times (breaking it), and ran off across the parking lot.

At this point, a "bunch of little kids" led by two women, later identified as Crichandra Llorens and Cathy Spitcock, started wheeling away Reher's bicycle. The neighbors had called the police and were allegedly trying to prevent Reher from leaving before the police arrived. Reher went over and said, "Let go of it. Don't steal my bike," to which the women responded by accusing

Reher of "filming the kids here." Reher denied that he had been videotaping the children and said that he had just been minding his own business. He then tried to wrest the bike away from the crowd, but eventually let it go out of concern for the children's fingers.

Within a few minutes, five Lombard police offi-cers—Officers Terry Evoy, Joseph Statkus, Paula Krupiczowicz, and defendants Frank Vivo and Marilyn Gabinski—arrived at the scene. Officer Vivo noticed that there was a group of 20 to 25 visibly upset residents near Officer Evoy, who was in the north end of the park. Some of them were screaming that a suspect was video-taping their children. The officers heard angry comments about "kids being photographed" and sex offenders. Llorens, also visibly upset and shaken, told the officers that she had seen Reher sitting in the park a couple of times before and that he was "probably, like, a perve or something out there looking at the children." Llorens at the time did not realize that Reher was Ashley's father.

According to Reher's deposition testimony, Sergeant Gabinski spoke to Outlaw, who claimed that Reher had been videotaping their daughter Ashley and the other children. Vivo, Gabinski, and another officer then ques-tioned Reher. They asked him what he was doing in the park. Reher told the officers that he was an amateur videographer and liked to tape nature scenes. He com-plained that the neighbors had taken his bike and broken his camera.

Gabinski, however, was not buying Reher's story. She remembered previous allegations Outlaw had lodged

against Reher, including that he kept her under surveillance. Gabinski knew that there was a history of domestic disputes and violations of orders of protection between Reher and Outlaw, and that Outlaw in the past had accused Reher of harassing her by telephone, throwing a rock through her window, and distributing nude photographs of her in the courtyard of her building. Without mincing words, Gabinski told Reher that she thought his story was "bullshit."

Upset at Gabinski's tone, Reher claims that he replied, "I don't want to talk to that bitch," referring to Gabinski. Vivo, who was present and heard the exchange between Reher and Gabinski, handcuffed Reher and placed him in a squad car. Reher claims that the moment he made the statement about Gabinski, Vivo looked at him and said, "That's it. You're under arrest. You can't swear at the boss and get away with it." (Vivo claimed in his deposition that Reher called Gabinski a "fucking bitch," raised his hand, and took a step toward her.) On the way to the station, Vivo told Reher that he was under arrest for disorderly conduct. The case against Reher was later dismissed.

Reher subsequently brought a § 1983 lawsuit against Vivo and Gabinski, claiming that he was arrested without probable cause. The officers moved for summary judgment. The district court granted the motion, finding that the officers had probable cause to arrest Reher, and that even if they did not, they were entitled to qualified immunity. Reher appeals.

## II. ANALYSIS

An officer's right to qualified immunity turns on: (1) whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and (2) whether the federal right at issue was clearly established at the time that the alleged violation occurred. *Jones v. Clark*, 630 F.3d 677, 682 (7th Cir. 2011). We may consider these questions in any order. *See Pearson v. Callahan*, 555 U.S. 223, 241 (2009). The relevant inquiry in determining whether a right is clearly established is whether it would have been clear to a reasonable officer that his conduct was unlawful in the situation the officer confronted. *Id.* at 231-32. Where the law is open to interpretation, qualified immunity protects police officers who reasonably interpret an unclear statute. *See Northen v. City of Chicago*, 126 F.3d 1024, 1027-28 (7th Cir. 1997).

Under Illinois law, "[a] person commits disorderly conduct when he knowingly . . . [d]oes any act in such unreasonable manner as to alarm or disturb another to provoke a breach of the peace." 720 ILCS 5/26-1(a)(1). To commit the offense of disorderly conduct, a person must engage in conduct that: (1) is unreasonable; (2) alarms or disturbs another; and (3) threatens to provoke or provokes a breach of the peace. *Id.; see also Biddle v. Martin,* 992 F.2d 673, 677 (7th Cir. 1993). Reher concedes that the police reasonably believed that the neighbors in the park were disturbed and that the police had sufficient information to indicate that a breach of the peace was threatened. Reher contends, however, that the police

lacked probable cause to arrest him because his conduct was not unreasonable.

An officer has probable cause to make an arrest only when the facts and circumstances within his knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect has committed an offense. *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001). The test is a purely objective one, meaning that an officer's subjective motivations have no bearing on the inquiry. *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003); *Harrell v. Cook*, 169 F.3d 428, 431 (7th Cir. 1999) (noting that "qualified immunity depends on the objective legal reasonableness of the defendants' actions, not on their subjective motivations"). In considering whether the officers here had probable cause, we draw all reasonable inferences and view the facts in the light most favorable to Reher. *See Grieveson,* 538 F.3d at 767.

Videotaping other people in public, while potentially intrusive, is not illegal in Illinois. *See Jones v. Kaminski*, 630 F.3d 677, 683 (7th Cir. 2011) (although neighborhood residents were concerned that plaintiff was taking pictures of their houses, "it is not a crime to take pictures on the street"); *Graham v. Village of Niles,* No. 02 C 4405, 2003 WL 22995159, at *6 (N.D. Ill. 2003) (videotaping in public in and of itself may not give police probable cause to arrest a person for disorderly conduct although videotaping accompanied by other suspicious conduct may) (citing Illinois cases); *cf. People v. Raibley*, 788 N.E.2d 1221, 1229 (Ill. App. Ct. 2003) ("A person's possession of

nonpornographic images of children does not create probable cause to seize that person's [videotapes] in the belief that it might contain child pornography."); 720 ILCS 5/26-4 (making it unlawful to film a person's undergarments through their clothes and to engage in other similar conduct without that person's consent).

But videotaping other people, when accompanied by other suspicious circumstances, may constitute disorderly conduct. *Graham*, 2003 WL 22995159, at *6 (citing Illinois cases and finding that probable cause existed when suspect surreptitiously videotaped women in parking lot and videotape contained images zooming in on women's breasts).

The difficulty, and the reason the officers in this case are entitled to qualified immunity, is that, given the lack of case law on point, a reasonable officer would not necessarily have known whether Reher's alleged videotaping of the children was suspicious enough to cross the line between "mere videotaping" and videotaping plus whatever else is necessary to give rise to disorderly conduct in Illinois. Certain things, however, should have been clear to the officers. It should have been clear that refusing to talk to and calling Gabinski a pejorative name was not enough to arrest Reher for disorderly conduct. *See Payne*, 337 F.3d at 777 ("Illinois courts have time and again held that arguing with a police officer, even if done loudly, or with profane or offensive language, will not in and of itself constitute disorderly conduct."). It also should have been clear that the neighbors' agitation, alone, did not give the officers

probable cause to arrest—especially since Reher claims to have told the officers that he remained calm when the neighbors accosted him and took his bicycle. 720 ILCS 5/26-1(a)(1) (requiring unreasonable conduct to commit disorderly conduct); *cf. Payne,* 337 F.3d at 777 ("Arguing with a police officer does not evolve into disorderly conduct merely because a crowd gathers to watch the argument.").

But here there was more. Gabinski, at least, was aware that there was a long history of domestic disputes between Reher and Outlaw. While the last such dispute had occurred several years before, the incidents Gabinski was aware of were fairly serious, and included distributing nude pictures of Outlaw in the apartment complex, throwing a rock through Outlaw's window, and violating orders of protection. At the scene, Outlaw accused Reher of harassing her and her daughter, and at least one neighbor told the police that she had seen Reher in the park before.

An arrest for disorderly conduct is justified when the defendant directly harasses or threatens other people. *See In re D.W.,* 502 N.E.2d 419, 420-21 (Ill. App. Ct. 1986) (defendant's threat to "kick [the complainant's] ass" supported arrest for disorderly conduct). And Illinois courts have found that behavior similar to stalking can form the basis of a disorderly conduct charge. *See People v. Hinton,* 360 N.E.2d 451, 453 (Ill. App. Ct. 1977) (probable cause existed to arrest suspect for disorderly conduct when suspect was peering inside windows of apartment complex); *see also People v. Rizzo,* 842 N.E.2d

727, 732 (Ill. App. Ct. 2005) (sufficient evidence existed to convict defendant discovered surreptitiously looking into woman's house under "window peeping" provision of disorderly conduct statute, 720 ILCS 5/26-1(a)(5)).

We find that, in light of Outlaw's accusations at the scene, it would have been reasonable for an officer with Gabinski's knowledge of Reher and Outlaw's turbulent history to conclude that Reher was harassing Outlaw and Ashley. Gabinski therefore had probable cause to arrest Reher for disorderly conduct. Even assuming otherwise, Gabinski would be entitled to qualified immunity. *Bevier v. Hucal*, 806 F.2d 123, 126 (7th Cir. 1986) ("Police officers are allowed to make [reasonable mistakes.]").

Whether Vivo is entitled to immunity is a closer question. He was not aware of Outlaw's allegations against Reher. "Under the collective knowledge doctrine, the knowledge of one police officer is imputed to other officers when they are in communication regarding a suspect." *United States v. Ellis*, 499 F.3d 686, 690-92 (7th Cir. 2007). But the district court found that the doctrine did not apply in this case because the extent of the communication between the officers was not clear, and we will not disturb that conclusion. *See id.* (police officer at side door did not have probable cause based on conversation between officers and suspect at front door because there was no evidence of communication between the officers at the scene and no evidence that the officer near the side door heard the conversation between suspect and officers at front door).

However, Vivo was aware that one of the women had accused Reher of videotaping the children. The same woman also told the officers that she was suspicious because she had seen Reher in the park several times before watching the children. Vivo would also have heard that Llorens, another neighbor, was worried that Reher was a sex offender or a peeping Tom. And while Reher counters that he did not start filming until Outlaw came up to him, police officers are, with some qualifications, entitled to rely on allegations by credible eyewitnesses when these supply probable cause. *See Askew v. City of Chicago*, 440 F.3d 894, 895 (7th Cir. 2006).

In this case, the neighbors' allegations were probably a bit too vague to support an arrest for disorderly conduct. Although there are no closely analogous cases, Reher's conduct does not strike us as being quite as invasive as the conduct that Illinois courts have previously found to support an arrest for disorderly conduct. The neighbors did not allege, for example, that Reher was getting close to the children, or that he was attempting to videotape their private parts. *Cf. Hinton*, 360 N.E.2d at 453; *Graham*, 2003 WL 22995159, at *6. However, the protection of qualified immunity applies to reasonable mistakes "based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231. And an officer faced with the circumstances present here could have reasonably, but mistakenly, believed that Reher was in fact harassing the children and alarming their parents, giving rise to probable cause to arrest. *See People v. Davis*, 413 N.E.2d 413, 415 (Ill. 1980) (disorderly conduct is "intended to guard against an invasion of the right of

others not to be molested or harassed, either mentally or physically, without justification"); *People v. Blair*, 748 N.E.2d 318, 322 (Ill. App. Ct. 2001) (noting that police arrested defendant for disorderly conduct because he was videotaping children in a public zoo but not discussing whether the defendant's arrest was supported by probable cause); *People v. Allen*, 680 N.E.2d 795, 800 (Ill. App. Ct. 1997) (lewd remarks and conduct may constitute disorderly conduct when directed at children); *see also Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998) (officers may not have had probable cause to arrest but were entitled to qualified immunity because it was unclear under then-current Illinois law what circumstances, in addition to arguing with a police officer, justified an arrest for disorderly conduct). Therefore, Vivo is entitled to qualified immunity.

## III.  CONCLUSION

The judgment of the district court is AFFIRMED.