Lee CATLEDGE, Plaintiff–Appellant,

v.

CITY OF CHICAGO, et al., Defendants–Appellees.

No. 16–1096

United States Court of Appeals, Seventh Circuit.

Submitted December 12, 2016 *

Decided December 13, 2016

* We have unanimously agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

Lee Catledge, Riverdale, IL, Pro Se.

Justin A. Houppert, Attorney, City of Chicago Law Department, Chicago, IL, for Defendants– Appellees.

Before MICHAEL S. KANNE, Circuit Judge ANN CLAIRE WILLIAMS, Circuit Judge DAVID F. HAMILTON, Circuit Judge

**ORDER**

This suit under 42 U.S.C. § 1983 against the City of Chicago and three of its police officers was previously before us. In August 2008 the plaintiff, Lee Catledge, was sitting in his parked car holding a video camera when a woman saw him and called police. The 911 operator wrote in the call log that a black male in his late forties was sitting in his parked car with a video camera "taping females" and had been there daily. Several officers responded and de-

tained Catledge, and two of the named defendants, Dale Martin and Danielle Kappel, searched his car without consent before releasing Catledge. He sued, claiming that the police did not have justification to detain him or probable cause to search his car. The district court initially dismissed the suit sua sponte with the explanation that Catledge did not state a Fourth Amendment claim against any defendant. After we overturned that ruling, *see Catledge v. City of Chicago*, 428 Fed.Appx. 646 (7th Cir. 2011), the district court granted the City's motion to dismiss on the ground that Catledge had not attributed the actions of the individual officers to a municipal custom or policy. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The court then granted summary judgment for the three officers. The court first reasoned that undisputed evidence establishes that Martin, Kappel, and the third officer, Russell McKnight (who did not help search Catledge's car), had reasonable suspicion to detain Catledge. The court then concluded that, although Martin and Kappel did not have probable cause to search, a jury could not reasonably find that they knew that probable cause was lacking, and, thus, these officers are protected by qualified immunity. Only this last conclusion is challenged by Catledge on appeal, so we need not say more about his *Monell* claim or his claim that he was detained without reasonable suspicion. On this record, however, we conclude that a jury reasonably could decide that Martin and Kappel knew they lacked probable cause to search Catledge's car.

Our review is de novo, and we evaluate the evidence in the light most favorable to Catledge. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). At summary judgment the defendants principally relied upon Catledge's complaint and deposition,

along with affidavits from McKnight and a City employee who handles 911 call records. (At summary judgment, both of the officers who searched Catledge's car stayed silent. Martin did not submit an affidavit or other form of testimony giving his version of the story. And throughout the litigation, Kappel insisted that she did not recall encountering Catledge or participating in the search of his car, though her involvement is not disputed for purposes of summary judgment.)

McKnight and the City employee, in contrast with the 911 operator's terse log entry, testified by affidavit that the caller had reported that she and other women were being videotaped by the man in the parked car. The police department dispatched McKnight, a uniformed officer working alone, and the two other defendants, Martin and Kappel, who were in plainclothes and riding together. McKnight, who arrived first, testified that he saw Catledge's car parked at the corner and noticed that the occupant matched the 911 caller's description. He parked with the lights on his ATV still flashing and approached Catledge "to conduct an investigatory stop." (When deposed, Catledge explained that he worked for a messenger service and often parked on that corner while waiting to be dispatched because parking there was free. A placard in the windshield identified the messenger company by name and by its state Commerce Department registration number.)

According to McKnight, after he told Catledge about the 911 call, the plaintiff responded that he had a video camera but it was broken and he was not using it to film women. Rather, Catledge explained to McKnight, he had been pointing the broken camera at a hovering helicopter. In his deposition Catledge explained that he had seen the same helicopter over his house, and, afraid that it was following him, tried to scare it away by pretending to film it. McKnight conceded that another officer then examined Catledge's camera and verified that it was broken.

In his affidavit McKnight says nothing at all about the search of Catledge's car. In fact, all of the details about the search come from Catledge's testimony, much of which the defendants adopted. In their motion for summary judgment, the defendants acknowledge that two of them (presumably Martin and Kappel) searched the car and Catledge's computer bag, even though they now knew that his camera was broken. All they found were "wires, plugs, and batteries," which Catledge explained were for the video camera and his computer. Martin and Kappel then departed temporarily, but when they returned a few minutes later they searched Catledge's car again.

In opposing the motion for summary judgment, Catledge relied on the evidence submitted by the defendants, along with police attendance logs establishing Kappel's presence on the day of the incident. (Although Catledge's response did not conform to Local Rule 56.1, the district court opted against rigorously applying that rule and instead considered Catledge's additional factual representations to the extent they are "material and properly supported." We do the same.) Catledge noted that the City employee—whose affidavit purports to rely on the 911 operator's call summary—exaggerates that document by asserting that the 911 caller had said that *she* was being videotaped and that the occupant of the car had been videotaping women every day. Catledge also augmented the defendants' account of the search. In his deposition Catledge had described how Martin and Kappel began searching his car without even saying a word to him. They ransacked the entire car, his toolbox, and several other bags including the com-

puter bag (where they found the cables and batteries), and dumped his belongings onto the street. They then left, he agreed, before returning and searching the car a second time.

Catledge also testified at his deposition that throughout the encounter he had asked the police officers what was going on but was told nothing and treated with disdain. When he asked why his car was being searched without a warrant, one officer retorted that Catledge would want them to investigate if someone had filmed his mother. Kappel, he said, had called him a "sick creep." Another officer said that "the Patriot Act" allowed them to search the car.

As noted, Catledge no longer claims that the investigatory stop was unlawful, but he continues to insist that Martin and Kappel can be held liable for searching his car. Those defendants, in contrast, continue to insist that they had probable cause to conduct a warrantless search based on the automobile exception. That exception allows police to search a vehicle if they have probable cause to believe that evidence of a crime or contraband is inside. *Arizona v. Gant*, 556 U.S. 332, 347, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009); *United States v. Edwards*, 769 F.3d 509, 511 (7th Cir. 2014). Martin and Kappel contend that, given the 911 call, the corroboration of Catledge's description and location, and his "strange

story" that he was pointing a broken camera at a helicopter, they had probable cause to believe that the car contained evidence that Catledge was stalking someone or engaging in disorderly conduct. They assert that his car could have contained "receipts or other indicators that Catledge had been in that location on multiple days or had been in other locations near the caller, notes pertaining to the subject of his stalking, media containing video recordings, binoculars, or a camera that was actually functional." All of these items, the officers say, would have supported charging Catledge with stalking.[1] The officers do not say what they expected to find that would be evidence that Catledge had engaged in disorderly conduct.[2]

But to have probable cause to believe that Catledge's car contained evidence of a crime, Martin and Kappel first needed probable cause to believe that he had committed a *crime*. And the district court rightly decided that the two officers did not have probable cause to conclude that Catledge had been engaged in criminal conduct. Videotaping other persons in public places is not illegal in Illinois, *Reher v. Vivo*, 656 F.3d 772, 776 (7th Cir. 2011), so the officers needed reason to believe that something more was going on. They contend that they had probable cause to suspect Catledge of stalking based on *United States v. Raibley*, 243 F.3d 1069, (7th Cir.

---

1. As relevant to this case, the 2008 version of the Illinois criminal code provided that a "person commits stalking when he or she, knowingly and without lawful justification, on at least 2 separate occasions follows another person or places the person under surveillance or any combination thereof and ... places that person in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement or restraint." 720 ILCS 5/12–7.3(a)(2) (the statute has since been amended, but in substance remains the same). The phrase "places a person under surveillance" means "(1) remaining present

outside the person's school, place of employment, vehicle, other place occupied by the person, or residence other than the residence of the defendant; or (2) placing an electronic tracking device on the person or the person's property." *Id.* § 5/12–7.3(d).

2. In Illinois, as relevant to this case, a person commits disorderly conduct when he or she knowingly "[d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILCS 5/26–1(a)(1).

2001). In that opinion we concluded that a police officer had reasonable suspicion to conduct an investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), after the officer confirmed with multiple Wal–Mart employees that a stranger from a city more than 200 miles away had been seen in the parking lot of the small-town store surreptitiously taping a 17–year–old female employee, that the man fled the parking lot after he realized others had noticed his taping, and that he later reappeared in the parking lot but fled again as soon as he saw a police officer. *Id.* at 1071–72, 1074–75. We do not understand how *Raibley* could be helpful to Martin and Kappel. True, the suspect's vehicle in that case was searched, but the suspect *consented*, and we were explicit that our decision was premised on the low threshold of reasonable suspicion needed for a *Terry* stop. *Id.* at 1074–75. Here the information available to the defendants pales in comparison, and yet they contend that *Raibley* supports a finding of probable cause to believe that Catledge was committing the crime of stalking. In *Raibley* the police first investigated (interviewing employees and running the license plate of the suspect's truck) before confronting him. That investigation heightened their suspicion, but in this case even the initial suspicion that had prompted the police dispatch had largely been dispelled by the time Martin and Kappel searched Catledge's car. They knew that Catledge's camera was broken (McKnight already had confirmed that the camera did not work, and although Martin and Kappel do not deny that this information actually was known to them as well, McKnight's knowledge was imputed to all of his colleagues at the scene, *see United States v. Whitaker*, 546 F.3d 902, 905 (7th Cir. 2008); *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000)), so all Martin and Kappel could surmise is that Catledge had been

sitting in his car on a corner, pointing his broken camera at passersby or skyward, neither of which would have been unlawful even if the camera worked. The defendants insist that Catledge's "strange story" that he was pointing his camera toward a helicopter "made Catledge's conduct more suspicious," but they do not explain how that explanation increased their suspicion that he was stalking women rather than simply paranoid but clearly harmless.

In *Raibley* we discussed how the information known to the police lined up with the statutory elements of § 5/12–7.3, *see* 243 F.3d at 1074–75, but Martin and Kappel, in contrast, have ignored those elements almost entirely. And, viewing the evidence in the light most favorable to Catledge, the two officers could not reasonably have seen any correlation between the information known to them and § 5/12–7.3. For one thing, the spin in the affidavit from the City employee, who lacked personal knowledge and could not do more than recite the literal words of the 911 operator's summary, greatly exaggerates the content of that summary. It might be that the 911 caller or the operator could testify that Catledge had been taping the caller or that he had been videotaping at that location multiple times, but the summary—the only admissible evidence on point—cannot be read to say either. Similarly, it is possible that the dispatcher broadcast more than what is in the summary or that the responding officers misinterpreted what they heard, but at summary judgment Martin and Kappel chose to remain silent and offered no admissible evidence from the dispatcher. A jury would not be required to accept the defendants' spin, and nothing in the 911 call summary suggests that Catledge had been outside of the woman's "school, place of employment, vehicle, other place occupied by the person, or residence" on even one occasion,

much less multiple occasions. 720 ILCS 5/12–7.3. Likewise, the evidence submitted by the defendants created a material dispute about the 911 caller's state of mind, another element of § 5/12–7.3. Although in his affidavit McKnight avers that the dispatcher told him that the 911 caller had said "she felt in fear of her safety," the call log—the only evidence offered by the defendants of the information received by the 911 operator and passed along to the dispatcher—flatly contradicts McKnight's testimony. Faced with competing evidence, a jury reasonably could disbelieve McKnight's after-the-fact recollection in favor of the police department's contemporaneous business record.

These weaknesses in Martin and Kappel's argument about stalking carry over to their argument about disorderly conduct. The defendants do not explain how the events transpiring after Catledge was detained could support a finding of probable cause that he had committed the offense of disorderly conduct, allowing them to search for "evidence" of that offense. Here the defendants rely upon our decision in *Reher*, where we recognized that, under Illinois law, "videotaping other people, when accompanied by other suspicious circumstances, may constitute disorderly conduct." 656 F.3d at 776. But Martin and Kappel ignore our preface for that conclusion. We could not have been clearer in stating that "[v]ideotaping other people in public, while potentially intrusive, is not illegal in Illinois." *Id.* What the officers knew in this case is that a man parked on a public street apparently was using a video camera to record women on the street—conduct that might have annoyed the 911 caller and others but which the officers would have known to be entirely lawful. And once they knew that Catledge's camera was broken, the defendants also knew he could not have been filming anyone, so any suspicion that he was engaged in some vague form of disorderly conduct had dissipated.

What Martin and Kappel have not done is point to the kinds of "suspicious circumstances" that could elevate the lawful, public use of a video camera into a crime, or even probable cause to believe that a crime had been committed. In *Reher*, the plaintiff had been in sight of his teenage daughter when the girl's mother ran up to him yelling that he was "not supposed to be there." 656 F.3d at 774. The plaintiff and the woman had ended their relationship soon after their daughter was born, and when the woman saw him pick up his camera and begin filming as she approached, she grabbed the camera and threw it to the ground. *Id.* Other parents, who previously had seen the plaintiff in the park, watched the unfolding commotion without realizing that the arguing couple had been involved years earlier. *Id.* Word quickly spread among the 20 to 25 visibly upset residents in the park that a "perve" was videotaping children, and the police were called. *Id.* One mother said that she had seen the plaintiff in the park multiple times. *Id.* His former girlfriend accused him of taping their daughter and other children. *Id.* And most significantly, one of the officers knew about the couple's past relationship, which included allegations that he had "kept her under surveillance," distributed nude photos of her, threw a rock through her window, and violated orders of protection. *Id.* at 775. Based on the officer's prior knowledge of the couple's tumultuous relationship, along with the crowd's accusations that the plaintiff had been videotaping their children, we concluded that the officer reasonably would have believed the plaintiff was harassing his former girlfriend, which could constitute disorderly conduct. *Id.* at 777.

In contrast, Martin and Kappel had no information available to them like the cir-

cumstances in *Reher*. They could have talked to the 911 caller but did not, and they did not have reason to question Catledge's statement that he had not been filming women. Moreover, after talking to Catledge, the defendants knew that he had not been harassing the 911 caller, *cf. People v. Davis* 82 Ill.2d 534, 45 Ill.Dec. 935, 413 N.E.2d 413, 416 (1980), and instead was focused on scaring away the helicopter. The caller's annoyance is irrelevant; whether conduct amounts to a breach of the peace—an element of disorderly conduct, *see Reher*, 656 F.3d at 775—it is not "measured by its effect upon those who are inordinately timorous." *People v. Raby*, 40 Ill.2d 392, 240 N.E.2d 595, 598 (1968). As we explained in *Reher*, "the neighbors' agitation, alone, did not give the officers probable cause to arrest." 656 F.3d at 776. Without probable cause at this point in the encounter, Martin and Kappel should have released Catledge, not searched his car. *See United States v. Leo*, 792 F.3d 742, 751 (7th Cir. 2015) (explaining that police must end a *Terry* detention if their suspicions have been dispelled or if they have not been able to develop probable cause within a reasonable period).

That probable cause was so lacking in this case—at least if the evidence is viewed in the light most favorable to Catledge—also forecloses the defendants' reliance on their defense of qualified immunity. On this question we disagree with the district court. A police officer loses the shield of qualified immunity if the facts, viewed in the light most favorable to the plaintiff, demonstrate that the officer's conduct constituted a violation of a clearly established constitutional right. *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 915 (7th Cir. 2015); *Lunini v. Grayeb*, 395 F.3d 761, 769 (7th Cir. 2005). The constitutional right to be free from unreasonable searches, including being free from searches of one's

vehicle if the police lack probable cause to conclude that it contains evidence of a crime, has been long established. And on this record a jury readily could conclude that Martin and Kappel, who have yet to offer their version of events, knew that they did not have probable cause to believe that Catledge had engaged in stalking or disorderly conduct. Instead a jury could find that the officers searched Catledge's car knowing full well that he had done nothing more than pretend to be engaged in lawful use of a video camera on a public street.

The officers argue that they have qualified immunity because there wasn't yet a clear interpretation of the Illinois disorderly conduct statute. Again, they base this argument on *Reher*'s statement that it was unclear what type of "other suspicious circumstances" would push "mere videotaping" over the line into disorderly conduct. 656 F.3d at 776. But as we just explained, the officers have not identified *any* suspicious circumstances, so it is irrelevant that ambiguity may exist regarding the kinds of suspicious circumstances that might suggest disorderly conduct. And as we have noted repeatedly, after the *Terry* investigatory stop, the officers knew that Catledge was not engaged in videotaping at all.

The grant of summary judgment on Catledge's claim that defendants Martin and Kappel searched his car in violation of the Fourth Amendment is VACATED, and that claim is REMANDED to the district court for trial. In all other respects, the judgment is AFFIRMED.